In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-2990

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CARLOS BELTRAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 CR 388 — **Joan B. Gottschall**, *Judge.*

ARGUED MAY 22, 2013 — DECIDED MAY 15, 2014

Before FLAUM, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury convicted Carlos Beltran of both possessing and conspiring to possess, with the intent to distribute, 500 grams or more of cocaine and one kilogram or more of heroin. *See* 26 U.S.C. §§ 841(a)(1), 846. The district court ordered him to serve a term of 168 months in prison. Beltran appeals, contending that the district court erred in denying his motion to suppress the evidence—including large

quantities of cocaine and heroin, and various items associated with narcotics trafficking—seized from his residence on the day of his arrest. We affirm.

**I.**

Our summary of the facts is based largely on the district court's findings below. We have, in a few instances, supplemented those findings with additional relevant details disclosed by the testimony presented at the suppression hearing.

Beltran owed a two-flat residence in Berwyn, Illinois. At approximately 2:30 p.m. on May 13, 2008, seven members of a federal Drug Enforcement Administration ("DEA") task force, comprised of both federal agents and local police officers, arrived at Beltran's residence to interview him. There was no response when they rang the doorbells for the first- and second-floor apartments and knocked at the front door, but five minutes later, task force officer Sam Ayyad spotted someone in a second-floor window and asked him to come down to the front entry. Beltran's co-defendant, Jesus Ivan Vazquez-Ramirez complied with Ayyad's request and came down to the front porch of the building.

Vazquez-Ramirez, who was conversing in Spanish with someone on his cell phone when he emerged from the building, informed the task force members that he did not speak English very well but that he had the owner of the building on the phone; he then handed the phone to DEA special agent Donald Wood. Beltran identified himself to Wood, and Wood explained that he and the other officers were at his residence and wished to speak with him. Beltran indicated that he was at work and that it would take him at least an hour to get home.

In response to Wood's inquiries, Beltran denied that there was any illegal contraband in the residence, agreed to let the officers conduct a search of the premises, but asked that they wait for his arrival before doing so. Beltran also advised the officers that he lived in the first floor of the building and that Vazquez-Ramirez lived in the second-floor apartment. Wood asked Beltran to inquire of Vazquez-Ramirez whether he would consent to a search of the upstairs apartment and handed the phone back to Vazquez-Ramirez. After a short conversation in Spanish between the two men, Wood re-took the phone and learned from Beltran that Vazquez-Ramirez would also agree to a search but that he too requested that the officers postpone their search until Beltran arrived. Wood agreed, ended the call, and returned Vazquez-Ramirez's phone to him. Vazquez-Ramirez remained on the front porch with several of the officers while they awaited Beltran's arrival. During the wait, Vazquez-Ramirez placed or received a number of calls (speaking in Spanish). He was sweating and appeared nervous to the officers.

About 15 minutes after Wood finished the call with Beltran, one of the officers, looking from the edge of the front porch toward the back yard, saw someone that he believed to be Beltran walk into the back yard from the alley, talking on his cell phone. (The officers had seen a picture of Beltran.) When that information was conveyed to the other officers, officer Mark Porlier moved toward the rear of the residence to a point where he could see over the back fence. Porlier could see that the back door to the building was closed and that there was no one in the back yard. He remained there. Meanwhile, agents Wood and Ayyad heard footsteps coming from the second

floor apartment and/or the stairway connecting the first and second floors; they also heard the door to the upstairs apartment being slammed shut. Vazquez-Ramirez, of course, was still in front of the building with the agents, and he had previously advised Wood that no one else was present in the building. Over the next 20 or so minutes, Vazquez-Ramirez remained on the front porch with the agents.

During this period, officer Mike Bedalow, who had posted himself in the alley behind the building immediately after Beltran's arrival, noticed a set of trash cans in the alley, just outside of the fence surrounding the back yard; the cans had the street number of Beltran's building stenciled on them. Bedalow decided to look inside the cans. He discovered packaging materials which, based on his training and experience, looked like they had been used to wrap one or more kilogram-sized "bricks" of narcotics. The materials were comprised of multiple layers of green plastic wrapping (variously described by the witnesses as resembling cellophane or Saran® wrap), packing tape, and dryer sheets (used to mask the odor of narcotics from police and drug-sniffing dogs). The discarded materials retained the brick shape of their previous contents.

Approximately 20 to 25 minutes after Porlier posted himself at the back of the residence, he saw Beltran emerge through the back door of the building with one of his hands inside of his shirt. Although Porlier called out to Beltran, directing him to place both of his hands where he could see them, Beltran did not immediately comply. Porlier walked over to Beltran and frisked him. Porlier felt something in Beltran's front pocket and asked him if it was cash; Beltran told him it that it was, and

Porlier was able to look into the pocket and confirm that it was a substantial roll of money. According to Porlier, Beltran was "sweating, seemed very nervous, and was shaking." R. 270 at 121.

When Wood was advised that Beltran had just emerged from the residence, he handcuffed Vazquez-Ramirez, left him on the front porch with Ayyad, and walked to the rear of the residence to speak with Beltran. He found Beltran to be visibly nervous and soaked in sweat, as if he had just been engaged in vigorous physical activity. Officer James Healy, who had accompanied Wood to the back yard, described Beltran as "all sweaty and he seemed out of breath and excited." R. 259 at 41.

Agent Wood asked Beltran what he was doing, and Beltran said that he had just arrived from work and was coming to talk to the agents. Wood believed that this was a lie, and that Beltran in fact had arrived some 20-plus minutes earlier. Beltran denied having just been inside of the building and insisted that he had just arrived in his car. When Wood asked Beltran to show him where he had parked his vehicle, Beltran led him to the alley and identified his car, parked halfway down the block. Wood noticed that there were several open parking spots much closer to Beltran's residence. Wood asked Beltran for the second time whether there was any contraband inside of the residence; once again, Beltran answered in the negative.

Also for the second time, Wood solicited Beltran's permission to search the residence and, initially, Beltran (again) gave it, adding that he did not have the authority to consent to a search of the second-floor apartment that Vazquez-Ramirez

was renting from him. But, at that point, the conversation took a turn. Beltran asked Wood whether he had a search warrant. Wood replied that he did not. Beltran then withdrew his consent for a search and indicated he would prefer that the agents obtain a warrant. Wood told him that was fine.

Wood began to secure the premises in order to maintain the status quo while a warrant was sought. The first step he took toward that end was to handcuff Beltran. He asked Beltran whether there was anyone else inside the residence. When Beltran replied that there was not, Wood asked him whether it would be alright if he looked inside to make sure. Beltran agreed. Wood and other officers then performed a protective sweep of the premises and confirmed that no one else was present.

At the conclusion of the sweep, Wood returned to the front of the residence and, with the help of a Spanish-speaking agent whom Wood contacted by telephone, solicited Vazquez-Ramirez's permission to search the second-floor apartment; Vazquez-Ramirez orally agreed to the search and thereafter signed a Spanish-language consent form. Wood and Healy then conducted a 10 to 15-minute search of the apartment. Inside of an otherwise empty bedroom in the apartment, they found two storage bins. One of the bins contained a money counter, packaging material similar to that which Bedalow had found in the garbage cans in the alley, and other items the officers believed were used in narcotics trafficking; the other bin contained over $1 million in cash. Elsewhere in the apartment, the officers discovered a loaded pistol.

Wood and Healy returned to the back yard, told Beltran what they had found in Vazquez-Ramirez's apartment, and advised him that he (Beltran) was going to be taken with the officers back to the DEA office where they would prepare an application for a search warrant. While Wood was walking Beltran to a vehicle, Beltran announced that he wished to cooperate and that he would agree to a search of his residence. The agents presented Beltran with a written consent form, which he signed after reading it.

The search of Beltran's first-floor residence and basement produced, among other items, a shotgun, scales, a heat sealer, two bottles of drug-cutting agents, more packaging material which was consistent in color and texture with the material found both in the upstairs apartment and in the trash cans left in the alley, and a number of clear plastic bags that were covered in some type of residue and appeared damp. A drug-sniffing dog later alerted to those baggies.

When agents looked inside of a washer and dryer located on the second floor landing outside of Vazquez-Ramirez's apartment, they found another large stash of money inside of the washing machine and, inside of the dryer, a Louis Vuitton bag containing approximately three kilograms of cocaine. A more thorough search of the bins in the apartment bedroom unearthed nine kilograms of heroin.

Beltran sat in the front room of his residence chatting with Porlier while the search was underway. Approximately 40 minutes after Beltran signed the consent-to-search form, he was read his *Miranda* rights, and Wood asked him whether he would agree to an interview. Beltran declined, indicating that

he had already cooperated by giving his consent to search his residence.

A grand jury subsequently indicted both Beltran and Vazquez-Ramirez of conspiring to possess and possessing 500 or more grams of cocaine and a kilogram or more of heroin with the intent to distribute them, in violation of sections 841(a)(1) and 846. They were also charged with possessing firearms in furtherance of drug trafficking activity. *See* 18 U.S.C. § 924(c). They both filed motions asking the court to suppress the large quantities of cocaine, heroin, and cash, among other evidence, discovered in the search of the two-flat. Beltran contended that his consent to search the portion of the building outside of the second-floor apartment was the product of coercion rather than free will, as Wood had hand-cuffed him when he insisted on a search warrant, which Beltran views as an arrest designed to pressure him into giving his consent.

The district court denied Beltran's motion to suppress (as well as his co-defendant's motion, which we need not discuss) after conducting a lengthy evidentiary hearing that featured testimony from Beltran, Vazquez-Ramirez (who had filed his own motion to suppress), and seven of the officers who played some role in the events of May 13, 2008. *See United States v. Beltran*, No. 08 CR 388, 2010 WL 379873 (N.D. Ill. Jan. 28, 2010). At the outset, the court noted that Beltran's account of events diverged materially from those of the officers; and after pointing out multiple aspects of Beltran's testimony that were shown to be false, the court credited the officers' version of events over his. *Id.*, at *5. From there, the court proceeded to

analyze the officers' interaction with Beltran upon his arrival at the residence.

The court agreed that Porlier had initiated an investigatory stop of Beltran when Beltran exited the back door of the residence and Porlier approached him and patted him down. *See Terry v. Ohio*, 392 U.S. 1, 21–22, 27, 30–31, 88 S. Ct. 1868, 1880, 1883, 1884–85 (1968). Based on the facts known to Porlier, the court held that reasonable suspicion supported both the stop and the frisk, as (1) Beltran, knowing that the officers were waiting to speak with him, had chosen to enter the building for some period of time rather than meet with the officers immediately upon his arrival; (2) the packaging materials discovered in the trash cans in the alley were suggestive of narcotics activity; and (3) drug trafficking is often associated with the use of firearms. Thus, Porlier could reasonably suspect that Beltran was engaged in narcotics trafficking and that he might be armed. 2010 WL 379873, at *10. Wood's decision to place handcuffs on Beltran was likewise appropriate, the court reasoned, given that Wood not only knew what Porlier knew but also had heard someone moving around the upstairs apartment. *Id.*, at *11. The court added that within a short time after Wood was placed in handcuffs, the reasonable suspicion that supported the investigatory detention of Beltran ripened into probable cause to arrest him, with the discovery of the one million dollars in cash, the loaded pistol, and the packaging materials in Vazquez-Ramirez's apartment. *Id.*

The court also found that Beltran's consent to search the remainder of the building was the product of his free will rather than coercion by Wood and the other officers. Because the court had deemed Beltran's detention to be lawful, his

consent was valid so long as the government proved by a preponderance of the evidence that Beltran gave that consent freely and voluntarily. *Id.* The court emphasized preliminarily that Beltran had admitted, during his testimony, that he understood what a search warrant was, that the officers needed a warrant to search his residence absent his consent, and that he had the right to withhold his consent. These admissions themselves "strongly suggest[ed]" to the court that Beltran's consent was voluntary. *Id.* Nonetheless, the court went on to consider Beltran's specific contentions to the contrary in light of the multiple factors we have identified as bearing on the knowing and voluntary nature of his consent. *Id.* (citing *United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006), and *United States v. Figueroa-Espana*, 511 F.3d 696, 704–05 (7th Cir. 2007)).

The court found it most significant that the officers had consistently adhered to Beltran's requests over the course of the encounter: At Beltran's behest, they waited for his arrival at the premises rather than proceeding immediately with a search after he told Wood over the phone that he would agree to a search; Wood respected Beltran's later withdrawal of his consent to search; and finally, it was Beltran who ultimately volunteered his consent once he learned what the officers had discovered in the upstairs apartment. *Id.*

Although Beltran argued that his consent was the product of what he characterized as "ever-present coercion" by Wood and the other officers—because they had "parked themselves" on his doorstep while awaiting his return, placed him in handcuffs when he arrived, and repeatedly solicited his consent to search, *see id.*, at *12—the court rejected this notion.

The fact that Beltran was in handcuffs did not "mechanically vitiate" his consent: Although Beltran had not yet been advised of his rights, he admitted that he understood his right to refuse; the fact that he had given, and then withdrawn his consent, and that the officers complied with his withdrawal, indicated that he had some control over their actions; and although he ultimately gave his consent to search the building, he did not agree to be interviewed. *Id.* And although his consent to search was solicited more than once, the court noted that Beltran had immediately agreed to a search during Wood's first conversation with him over the phone, which indicated to the court that there was nothing magical about the fact that Beltran was asked more than once for his permission to search the residence. *Id.*, at *13.

Finally, the court rejected Beltran's contention that Wood's declaration that he would get a search warrant was a "threat" aimed at pressuring Beltran to yield. Beltran had withdrawn his consent to search at that point, Wood had a reasonable factual basis to believe he had probable cause for a search warrant, and he signaled his intent to obtain a warrant in response to Beltran's expressed wish that the officers follow that very course. In short, the court was not persuaded that Wood's declaration was a mere pretext aimed at coercing Beltran to (again) give his consent. *Id.*

After the court denied Beltran's motion to suppress, he proceeded to trial. (Vazquez-Ramirez pleaded guilty.) The jury convicted Beltran on the two narcotics charges, although it acquitted Beltran on the firearm charge. The sole issue that Beltran pursues on appeal is whether the district court properly denied his motion to suppress.

## II.

Beltran's appeal hinges on two key contentions: first, that he was effectively arrested before the officers had probable cause to believe he was involved in anything criminal, and second, that his consent to search his residence was the product of both the wrongful arrest and the additional efforts of Wood and the other officers to (allegedly) coerce him into consenting.

The first contention hinges on the notion that what began as a proper *Terry* stop morphed into a wrongful arrest once Wood placed him in handcuffs. Beltran does not dispute that there was reasonable suspicion for Porlier to commence an investigatory detention, nor does he quarrel with Porlier's decision to pat him down. But once Porlier had frisked him and discovered him to be unarmed, Beltran argues, there was no reason to believe that he needed to be physically restrained while the officers pursued their investigation. *See, e.g., United States v. Glenna*, 878 F.2d 967, 972–73 (7th Cir. 1989) (finding decision to place defendant in handcuffs did not transform investigatory detention into arrest, where officers had reason to believe defendant was armed and dangerous, and that concerns for officer safety therefore justified use of restraints; "we are unwilling to hold that under *Terry*, the placing of a suspect in handcuffs without probable cause is *always* unlawful") (emphasis in original); *but see also United States v. Howard*, 729 F.3d 655, 661 (7th Cir. 2013) ("Handcuffs in a *Terry* stop and frisk are not and should not be the norm.").

Beltran is correct that physically restraining someone, as by putting him in handcuffs and/or confining him in the back of

a police car, normally is indicative of an arrest. *See Glenna*, 878 F.2d at 972; *see also United States v. Newton*, 369 F.3d 659, 676 (2nd Cir. 2004) (collecting cases). The government counters that this is not invariably so, invoking *Glenna* and its progeny to argue that the use of handcuffs in this case was both justified and consistent with the purposes of a *Terry* stop, and thus did not transform the stop into an arrest. It reasons that in view of the officers' reasonable suspicion that Beltran was involved in drug trafficking, which often involves firearms, it was appropriate for the officers to restrain Beltran for officer safety while they pursued their investigation, even after the patdown revealed that he was unarmed. Handcuffing Beltran was particularly appropriate, the government maintains, given that the officers had reason to believe that he was not only lying about when he had arrived home from work and whether he had been inside the building, but likely was attempting to destroy evidence.

We need not decide whether the use of handcuffs was consistent with an ongoing *Terry* stop under the rationale of *Glenna* and its progeny. For even if we assume that placing Beltran in handcuffs transformed the investigatory stop into arrest, we believe, contrary to Beltran's premise, that Wood had probable cause to arrest Beltran at that point in time.

Making a materially false statement to a federal agent is a crime. *See* 18 U.S.C. § 1001(a)(2).[1] When Wood confronted Beltran after Beltran emerged from the building and asked him

---

[1]   This possibility was at least minimally raised during the suppression hearing and in the briefing below and on appeal. *See* R. 97 at 8; R. 259 at 238–29; Gov't Brief at 20 n.3.

what he was doing, Wood had reason to believe that Beltran told him at least two lies: (1) that he had just arrived on the premises, and (2) that he had not been inside the two-flat. Both statements were demonstrably false in light of what Wood and his colleagues knew. Beltran had been seen sneaking into the back yard from the alley some 20 to 25 minutes earlier, and Wood had heard him "rummaging around" upstairs, to use the district court's phrase. 2010 WL 379873, at *2. *See United States v. Amaral-Estrada*, 509 F.3d 820, 827–28 (7th Cir. 2007) (defendant's statement to agent that he knew nothing about automobile that agent "had just seen him park and exit moments earlier" supplied probable cause to arrest defendant for making false statement in violation of § 1001). Beltran's false statements were material in the sense that they constituted an effort to cover up his evident attempt to conceal or destroy evidence, itself a federal offense. *See* 18 U.S.C. § 1512(c)(1) (construed in *United States v. Johnson*, 655 F.3d 594, 603–05 (7th Cir. 2011)), and § 1519; *see also United States v. Lupton*, 620 F.3d 790, 806–07 (7th Cir. 2010) ("When statements are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand absolutely no chance of succeeding, they satisfy the materiality requirement of 18 U.S.C. § 1001."). In short, the facts confronting Wood warranted a reasonable person in believing that Beltran had just committed a crime. *See*, *e.g.*, *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013) (defining probable cause to arrest). It does not matter whether Wood had section 1001 in mind when he placed Beltran in handcuffs; what matters is that given the facts known to him at that time, he reasonably could have believed that Beltran had made a false statement to him in violation of that statute.

*See Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588, 593–94 (2004); *see also*, *e.g.*, *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013); *Williams v. Rodriguez*, 509 F.3d 392, 399 (7th Cir. 2007).

As the district court noted, not long after Beltran was handcuffed, the officers developed probable cause to believe that Beltran was implicated in additional crimes. Once the officers searched the upstairs apartment with the consent of Vazquez-Ramirez, they discovered more of the packaging material, a loaded firearm, and over a million dollars in cash. Those additional discoveries, coupled with Beltran's evasive behavior and the other facts known to the officers, warranted a reasonable belief that Beltran was engaged in narcotics trafficking.[2] Notably, the search that yielded these discoveries took place within a short time after Beltran was placed in handcuffs. The record reflects that less than 20 minutes separated the written consent to search that Vazquez-Ramirez signed from the written consent that Beltran signed after he was informed of what the officers had discovered in Vazquez-Ramirez's apartment. (By that time, Wood had informed Beltran that he was going to be detained and taken with the officers back to the DEA office.)

---

[2] Beltran has contended that there was no evidence linking the narcotics-related materials to him: no one saw him placing the packaging materials in the alley trash cans for example, and the million-plus dollars in cash, the pistol, and the other items that were discovered in his tenant's apartment rather than his own. But particularly in light of Beltran's surreptitious entry into the building and his activity upstairs before he emerged and was detained, it was entirely reasonable for the officers to believe that he had a culpable connection to those materials.

The remaining question is whether Beltran's consent to search the remainder of the building was voluntarily given. As the district court recognized, the government bore the burden of proof on this point. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045 (1973) (collecting cases); *see also*, *e.g.*, *United States v. Hicks*, 650 F.3d 1058, 1064 (7th Cir. 2011). Factors bearing on this question include (1) Beltran's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether he was in police custody when he gave his consent. *E.g.*, *United States v. Pineda-Buenaventura*, 622 F.3d 761, 776 (7th Cir. 2010); *United States v. Raibley*, 243 F.3d 1069, 1075–76 (7th Cir. 2001). The court's finding that Beltran's consent was freely given is a factual determination that we review for clear error. *E.g.*, *United States v. Groves*, 530 F.3d 506, 513 (7th Cir. 2008).

There was no obvious mistake in the court's well supported and thoroughly explained finding that Beltran's consent was freely given. Certain of the relevant factors weigh negatively in the calculus: Beltran was not only in custody but in handcuffs at the moment he gave his consent, and he had not yet been advised of his constitutional rights. Beltran naturally focuses on the arrest and the restraints, arguing that Wood placed him in handcuffs with the aim of extracting his consent and that there was no intervening event, act of will, or significant passage of time sufficient to attenuate his consent from his arrest. Yet, as the district court rightly emphasized, Beltran not only demonstrated a willingness to consent during his first

(telephonic) contact with Wood, but more to the point, he saw first hand that Wood and the other officers would accede to his wishes with respect to a search of his residence: They waited for him to arrive at the residence as he requested, and when Beltran withdrew his consent to search after twice having given it, expressing a wish that the officers obtain a warrant, Wood told him that was fine and that they would obtain a warrant. (There is no indication that Wood's statement about obtaining a warrant was pretextual.) And as the court pointed out, even after Beltran changed his mind and allowed the search to proceed, he declined to be interviewed, citing his consent to the search as sufficient cooperation—thereby demonstrating a willingness and ability to exercise his constitutional prerogatives as he chose. Beltran admitted at the hearing that he understood what a search warrant was, that in the absence of his consent the officers would have to obtain a warrant, and that he had the right to refuse his consent; and from the sequence of events during his encounter with the task force officers, one could reasonably conclude, as the district court did, that Beltran was able to make an informed, deliberate, and voluntary choice whether to waive his constitutional rights. "[W]e have held that an arrested, handcuffed suspect is capable of giving voluntary consent to the search of his home," *United States v. Figueroa*, 622 F.3d 739, 742 (7th Cir. 2010) (citing *United States v. Bernitt*, 392 F.3d 873, 876–77 (7th Cir. 2004)), and the record lends sufficient support to the district court's finding that when Beltran orally consented to the search, and confirmed that consent in writing, he did so knowingly and voluntarily. It is a fair inference that once the search of Vazquez-Ramirez's apartment had exposed the over one

million dollars in cash and other incriminating items, Beltran rightly surmised that a search warrant for the remainder of the premises was inevitable, and he made a calculated decision to cooperate by allowing the search of his residence to proceed.

### III.

The district court correctly concluded that Beltran was not wrongfully arrested when the officers placed him in handcuffs; the officers had probable cause to believe that Beltran had made materially false statements to a federal officer in violation of § 1001. The court also committed no clear error in finding that Beltran's subequent consent to search his residence was knowingly and voluntarily given. Finding no error in the denial of Beltran's motion to suppress, we AFFIRM the judgment.