In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1105

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDWARD THOMPSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 CR 616 — **Sara L. Ellis**, *Judge.*

ARGUED SEPTEMBER 22, 2016 — DECIDED NOVEMBER 22, 2016

Before BAUER, POSNER, and MANION, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendant–appellant, Edward
Thompson, was indicted on one count of possession with
intent to distribute 500 grams or more of cocaine in violation
of 21 U.S.C. § 841(a)(1). He filed a motion to suppress the
cocaine that was seized after he gave his consent for law
enforcement to search his apartment. He argued that a series
of Fourth Amendment violations led to the discovery of the

contraband and that his consent was not voluntary. The district court denied Thompson's motion. We affirm.

## I. BACKGROUND

The district court held a suppression hearing, during which it heard testimony from six witnesses. Thompson's account of the events differed in various respects from that of the law enforcement officers involved. In his written opinion denying Thompson's motion, Judge Shadur did not set forth all of his factual findings in great detail; he did however, make clear that his analysis was based on his determinations that "Thompson's version of the events is not at all believable" and that there is "no reason to credit" his testimony. The following is a synopsis of the relevant facts based on those determinations.

On March 6, 2013, a joint task force of the Drug Enforcement Agency and Chicago Police Department was conducting surveillance on the residence of Armando Soto in Cicero, Illinois, as part of an ongoing investigation into a drug trafficking organization. The agents (for the sake of ease, we refer to all law enforcement officials involved as "agents") received information that a man named Marvin Bausley would be arriving at Soto's house to pick up some or all of ten kilograms of cocaine. Shortly before noon, agents observed Bausley drive into the alley behind Soto's house and enter the garage. After approximately ten minutes, Bausley left the garage and, with agents following, drove to an apartment building in Chicago, Illinois.

Bausley parked on the street outside the building, and a man, later identified as Thompson, came out of the building wearing a backpack and entered Bausley's car. Bausley drove

once around the block and again stopped outside the apartment building, at which time Thompson exited the car and reentered the building. The agents who saw Thompson go into the building communicated this to Special Agent David Reynolds, who was on the scene, but could not see Thompson. Agent Reynolds quickly entered the apartment building, but saw no one in the lobby. He recalled that an apartment at this address had been of interest in their ongoing investigation; he believed the relevant apartment number was 901. He saw that the elevator door was open so he rode it to the ninth floor.

When Agent Reynolds arrived on the ninth floor, he saw Thompson and a woman waiting for the elevator. Agent Reynolds had not seen Thompson earlier and did not recognize him as the man that had been in Bausley's car.

Agent Reynolds exited the elevator, and Thompson and the woman entered. As he looked around the ninth floor common area, other agents notified Agent Reynolds that the man who was in Bausley's car was now in the lobby. Thompson did not have the backpack he was wearing earlier. Agent Reynolds returned to the lobby, approached Thompson, and asked him if he lived in the building. Thompson said he did not and that he was only there to visit a friend on the fourth floor. Agent Reynolds then asked if Thompson had just been on the ninth floor, and again, Thompson said no.

Agent Reynolds told Thompson that he was not under arrest and that he was not required to speak to the agents. Agent Reynolds conducted a patdown to ensure that Thompson had no weapons. He found no weapons, but he retrieved Thompson's key ring. Agent Reynolds testified that he could

not recall whether the keys were in Thompson's pocket or in his hand. The key ring held Thompson's apartment keys, as well as an electronic fob that was required for access to the building's elevators. Again, Agent Reynolds asked whether Thompson had just been on the ninth floor and whether Thompson lived in the building. Thompson again answered "no" to both questions.

At this point, Agent Reynolds asked Thompson if he would speak to the agents on the ninth floor, and Thompson agreed. Using the fob on the key ring, Agent Reynolds accessed the elevator, and Thompson and the agents went to the ninth floor. Thompson did not ask for his keys back at any point, and Agent Reynolds testified that Thompson was not handcuffed.

Because Agent Reynolds believed that unit 901 was relevant to their investigation, the agents knocked on that door with guns drawn. The resident of that unit answered and agents ordered him to get on the floor, while they quickly swept his apartment. After approximately a minute, the agents realized this was the wrong unit and returned to the hallway.

Agent Reynolds then asked Thompson if he lived in unit 902, and Thompson said he did not. Agent Reynolds tried Thompson's key on the lock of 902 and the door opened. He then asked Thompson if there was anyone inside the apartment, and Thompson did not respond. Agent Reynolds and one other agent performed a sweep of the apartment, which lasted approximately 30 to 45 seconds, to ensure no one else was present. Finding no one in the apartment, the agents returned to the hallway. Agent Reynolds then asked Thomp-

son if they could speak inside the apartment, and Thompson agreed.

Once inside, Agent Reynolds again told Thompson that he was not under arrest and that he did not have to talk to the agents. He then asked Thompson for consent to search the apartment. Agent Reynolds produced a written consent form and read it to Thompson. He handed it to Thompson to allow him to read it himself, and Thompson signed the form. Thompson then told the agents that there was a gun in the TV stand and that there were drugs and cash elsewhere in the apartment. The agents recovered the gun, a kilogram of cocaine, and $10,000 in cash. Thompson was not arrested that day and agreed to cooperate with the agents in their investigation moving forward. A number of days later, when Thompson stopped answering calls from the agents, he was arrested.

Thompson was charged with one count of possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1). Thompson filed a motion to suppress the evidence recovered at his apartment, as well as statements he made to the agents. The district court held a suppression hearing, after which it denied Thompson's motion. Thompson pleaded guilty, but preserved the right to appeal the denial of his motion to suppress, which he does now.

## II. DISCUSSION

On appeal, Thompson argues that, before he provided consent to search his apartment, the DEA agents committed a series of Fourth Amendment violations. He argues that the evidence recovered was the fruit of those violations and, as such, it should have been suppressed. He also argues that his

consent was not voluntary. The district court did not find that any constitutional violations occurred and held that Thompson's consent was knowing and voluntary. We review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Bernitt*, 392 F.3d 873, 876 (7th Cir. 2004). "In the context of a motion to suppress evidence, we give special deference to the district court's rulings due to the fact-specific nature of the proceeding." *United States v. Griffin*, 150 F.3d 778, 783 (7th Cir. 1998) (citing *United States v. Stribling*, 94 F.3d 321, 323 (7th Cir. 1996)).

### A. Initial Stop

Thompson first complains of his initial encounter with law enforcement. When he exited the elevator in the lobby, a number of agents stopped him. Thompson argues that this encounter constituted an unlawful seizure because the agents did not have reasonable suspicion to stop and question him. This argument is meritless. A law enforcement officer may briefly stop an individual for investigative purposes if the officer "has a reasonable suspicion supported by articulable facts that criminal activity is afoot." *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981).

Here, the agents had ample reason to believe that Thompson was engaged in criminal activity. Minutes prior to the encounter in the lobby, the agents witnessed Thompson get into a car with Bausley, who they had reason to believe had

just picked up a large amount of cocaine. They watched Thompson enter the car wearing a backpack, circle the block with Bausley, go back into the apartment building, and then return to the lobby without the backpack. These facts were more than sufficient for the agents to form a reasonable suspicion that Thompson was engaged in criminal activity, which justified their encounter with him in the lobby.

### B.  Agent Reynolds' Frisk

Thompson's next contention is that Agent Reynold's frisk of Thompson in the lobby was an unconstitutional search. An officer conducting a lawful *Terry* stop may not automatically frisk the subject of the stop. *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013) (citing *Arizona v. Johnson*, 555 U.S. 323, 323 (2009)). Such a frisk is lawful only when the officer has some articulable suspicion that the subject might be armed and dangerous. *Id.* As we just explained, by the time Agent Reynolds encountered Thompson, he clearly had reason to believe that Thompson was participating in a drug trafficking operation. Based on that belief, it was reasonable for Agent Reynolds to suspect that Thompson was armed because guns are known tools of the drug trade, as our cases have recognized. *See, e.g.*, *United States v. Gully*, 722 F.3d 901, 909 (7th Cir. 2013) ("[I]t is widely known that guns and drugs go hand in hand."); *see also United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) (recognizing the "inherent danger in stopping those suspected of drug trafficking, for which guns are known tools of the trade."). Moreover, Agent Reynolds knew that Thompson had just lied to him about being on the ninth floor, which likely raised his suspicion even higher. These circumstances could have reasonably led Agent Reynolds to believe

that Thompson might be armed, and therefore, justified the patdown.

### C.  Thompson's Keys and Trip to Ninth Floor

Thompson then argues that by taking his keys and accompanying him to the ninth floor, Agent Reynolds committed an unlawful seizure and converted the encounter into an unlawful arrest without probable cause. Prior to taking his keys, Agent Reynolds told Thompson that he was not under arrest and that he did not have to speak to the agents. Additionally, before using the keys to access the elevator, Agent Reynolds asked Thompson if he would speak with the agents on the ninth floor and Thompson agreed. Agent Reynolds testified that Thompson was never handcuffed. Thompson never asked for his keys back and voluntarily accompanied the agents to the ninth floor. Based on these facts, we are not convinced that Thompson was under arrest prior to, or upon arriving on the ninth floor.

But, even if we assume that Thompson was in fact under arrest at this point, we find no constitutional violation because Agent Reynolds had probable cause to arrest him. Prior to frisking him and taking his keys, Agent Reynolds knew that Thompson had lied to him about not being on the ninth floor. Thompson repeated this lie once more before they entered the elevator. Under 18 U.S.C. § 1001(a)(2), "[m]aking a materially false statement to a federal agent is a crime." *United States v. Beltran*, 752 F.3d 671, 678 (7th Cir. 2014). When Thompson told Agent Reynolds he was not on the ninth floor, Agent Reynolds had probable cause to arrest him for violating that statute. Thompson's lies were material because they had the obvious intention of misdirecting Agent Reynolds and his investiga-

tion. *See United States v. Lupton*, 620 F.3d 790, 806–07 (7th Cir. 2010) ("When statements are aimed at misdirecting agents and their investigation, … they satisfy the materiality requirement of 18 U.S.C. § 1001."). It does not matter whether Agent Reynolds actually had this statute in mind at the time that Thompson lied. *See Beltran*, 752 F.3d at 678 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). What is important for our analysis is whether, given the facts Agent Reynolds knew at the time, he could have reasonably believed that Thompson made a false statement to him in violation of that statute. *Id*. That was clearly the case here.

### D.  Sweep of Thompson's Apartment

Finally, Thompson contends that his Fourth Amendment rights were violated when Agent Reynolds put the key in the lock of unit 902 and performed a sweep of the apartment before obtaining Thompson's consent. We have previously characterized the placement of a key in a lock as a "search" for Fourth Amendment purposes. *United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991). However, because the privacy interest in the information held by a lock (*i.e.*, the verification of the key owner's address) is so small, officers do not need a warrant or probable cause to perform such a search. *See id.* at 1173 (noting that law enforcement is entitled to learn a suspect's address without a warrant and can do so in numerous ways).

As to the initial sweep of Thompson's apartment, we agree with the district court that this was not an unlawful search."[1] A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). An officer may perform a "cursory visual inspection of those places in which a person might be hiding" if he has a reasonable belief, based on specific and articulable facts, "that the area swept harbored an individual posing a danger to the officer or others." *Id.* The inquiry as to the reasonableness and validity of a protective sweep is necessarily fact-specific. *United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995). "The less intrusive a search, the less justification is required." *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995). "The question posed by the fourth amendment is not whether it would have been reasonable to get a warrant, but whether the search itself was reasonable." *Id.* (citing *United States v. Edwards*, 415 U.S. 800, 807 (1974)).

Here, the agents were involved in a long term investigation of a large scale drug trafficking organization. As we have established, guns are known tools of the drug trade and interactions with those suspected of drug trafficking present an inherent danger to law enforcement. As the door was opening,

---

[1] Thompson argues that we must remand on this point because the district court did not address its argument that the sweep constituted an unlawful search. We disagree. The district court's written opinion states, "In brief, this Court credits the government's position that no search of Thompson's residential apartment was conducted, even after he had given oral consent to such a search, until Thompson was presented with and signed the consent–to–search form."

Agent Reynolds asked Thompson whether anyone was inside and received no response. Thompson had already lied to Agent Reynolds about being on the ninth floor and when he used the key on the lock, he knew that Thompson had lied again about living in the building. Those facts are sufficient to give a reasonable agent cause to take precautions. He and one other agent performed a sweep for 30 to 45 seconds, during which time they did not move any items or search inside any containers or compartments. They did not find any contraband in this initial sweep and did not linger in the apartment any longer than needed to secure it. Upon completing the sweep, they exited the apartment to obtain Thompson's consent to perform a search. The agents' actions here were minimally intrusive and reasonable under the circumstances. *See id*.

Thompson also contends that this was an illegal search because a protective sweep can only be valid if it is performed incident to an arrest. Ignoring that this stands in contrast to his earlier argument that he was under arrest when the agents accompanied him to the ninth floor, his argument fails for other reasons. First, this Court has held that an arrest is not a requirement for a valid protective sweep. *United States v. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013) ("Thus the constitutionality of a protective sweep does not depend on whether that sweep is incidental to a search warrant, an arrest warrant, or a consensual search."). Second, as already discussed, the agents had probable cause for Thompson's arrest before they entered the apartment.

### E.  Voluntariness of Thompson's Consent

We now turn to the voluntariness of Thompson's consent to search his apartment. Thompson argues that his consent was tainted by the constitutional violations committed by the agents leading up to that consent. *See, e.g.*, *United States v. Robeles-Ortega*, 348 F.3d 679, 681 (7th Cir. 2003) (setting forth the factors used to determine whether consent to search is tainted by an initially illegal search (citation omitted)). We need not address this argument, however, because, as explained above, we do not find any Fourth Amendment violations that could have tainted Thompson's consent.

Therefore, we need only determine whether the district court correctly found that Thompson's consent to search his apartment was given voluntarily. "Whether an individual's consent to search was voluntary is a factual question, which we review for clear error." *United States v. Richards*, 741 F.3d 843, 847 (7th Cir. 2014). The following factors are considered in determining whether consent is voluntary: (1) the age, education, and intelligence of the individual; (2) whether he was advised of his rights; (3) whether he was in custody; (4) how long the individual was detained prior to consenting; (5) whether consent was given immediately or after several requests; and (6) whether the officers used physical coercion. *Id.* at 848. "Our determination does not depend on a single controlling factor, but carefully considers 'all of the surrounding circumstances.'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

Thompson argues, unpersuasively, that the district court did not make findings of fact sufficient to support its determi-

nation that Thompson's consent was voluntary. It is true that the district court did not explicitly address each of the above listed factors in its written opinion. However, it is clear from the record that the court heard testimony regarding all of the factors and "all of the surrounding circumstances."

There was no contention that Thompson's age or level of intelligence prevented him from providing voluntary consent. Prior to giving his consent, Thompson was told twice (once in the lobby and once in the apartment) that he was not under arrest and that he did not have to speak to the agents. By Thompson's own estimation, the entire ordeal lasted approximately 30 minutes. Thompson was asked, and agreed, to go with the agents to the ninth floor. After the protective sweep, and while he and all of the agents were standing outside the apartment, Thompson was asked, and agreed, to speak with agents inside his apartment. There, Agent Reynolds read him the consent form, Thompson read it himself, and then proceeded to fill it out and sign it. Thompson did not claim that he was asked more than once to provide his consent. There was no contention that any of the agents used or threatened physical force against Thompson. After providing his consent, Thompson voluntarily directed the agents to the locations of the contraband in his apartment. Given "all of the surrounding circumstances," the district court did not commit clear error in determining that Thompson's consent was voluntary.

### III.  CONCLUSION

The agents did not commit any violations of Thompson's Fourth Amendment rights that could have tainted his consent to search his apartment. We do not find clear error in the

district court's determination that Thompson's consent was given voluntarily. Therefore, we AFFIRM the denial of his motion to suppress.