In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-1918

BEVERLY THOMPSON,

*Plaintiff-Appellant*,

*v.*

DAVID E. WAGNER and KEITH GARDNER,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 4266—**John W. Darrah**, *Judge.*

ARGUED SEPTEMBER 17, 2002—DECIDED FEBRUARY 13, 2003

Before COFFEY, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* Several things don't quite add up in this bizarre little case, which started at a flea market and ended with the brief arrest of a 50-year-old cake decorator at a Kroger's grocery store some 5 months later. The case is here for our review of a district court's grant of summary judgment on qualified immunity grounds to the defendants, two members of the Kane County (Illinois) sheriff's department.

We know little about the Kane County flea market where this saga started, but we do know that a "flea market" conjures up images of booths where sellers display items—used household goods, antiques, pieces of bric-a-

brac, for example—on card tables, hoping to entice wandering buyers to part with their money. We can assume, for our purposes, such a scene in early December of 2000 when a seller, Diane Richardson, sold items to a purchaser named Chuck Berry. We won't assume, however, that "Chuck Berry" was *The* legendary "Chuck Berry" who rode classics like "Maybellene," "Sweet Little Sixteen," and "Johnny B. Goode" into the Rock 'n Roll Hall of Fame.

The items Richardson sold to Berry—two diamond rings—strike us as odd for a flea market. The price paid—over ten thousand dollars—seems even odder. And the method of payment—two separate personal checks from Berry, a stranger to Richardson, seems odder still. Yet, that is what everyone seems to agree happened.

Soon after the checks—surprise, surprise—bounced, Richardson complained to the Kane County sheriff's department, and two deputies, our defendants David Wagner and Keith Gardner, were put on the case. They interviewed Berry 2 weeks after the sale at a correctional facility where he was in custody on an unrelated matter. Berry admitted writing two bad checks totaling $10,475 for the rings, each a tad over a carat. Berry said two gentlemen, Myers and Risch, who were with him when he purchased the rings, had them. Myers and Risch were, like Berry, local felons. The deputies interviewed Myers and Risch and both admitted being present at the sale, but each denied ever possessing the rings. Each said the other had the rings and may have given them to a girlfriend. Later, 5 months removed from the flea market sale, Myers changed his tune. He said he did, in fact, possess one of the rings at one time (the man's ring; the other was a woman's), and his new story went like this:

- Risch gave Myers a men's 2 carat diamond ring (never mind that the two flea market rings were a carat each!);

- Myers gave the 2 carat diamond ring to his girl-friend, Delores Henry;

- Henry removed the diamond from the ring and placed the stolen diamond into one of her own rings;

- Henry gave her ring with the stolen 2 carat diamond to her brother, Robert Thompson, in exchange for a car;

- Robert Thompson removed the diamond from the ring and placed it into the wedding ring of his wife, Beverly;

- Beverly Thompson wears her wedding set, with the 2 carat diamond, on her left hand;

- Myers took back the men's ring (minus the 2 carat diamond) from Henry;

- Myers placed a cubic zirconia stone into the men's ring and was going to return it to Risch. The ring, with the cubic zirconia stone, was given to the deputies.

After speaking with Myers, and now 166 days after the flea market sale, our two deputies decided to go to the Kroger store in Ottawa, Illinois, where 50-year-old Beverly Thompson had worked for more than 20 years in its bakery department. Mrs. Thompson, by the way, had no criminal record, and the officers' visit was made without any additional investigation on their part. For instance, no one looked to see if Delores Henry had in fact recently received a car from Robert Thompson, her brother. They didn't know if the ring (minus the diamond) received from Myers matched one of the two sold by Mrs. Richardson at the flea market. Also, our deputies were not gemologists. They had no training whatsoever in identifying diamonds as to cut, clarity, carat weight, or value. For all they knew, the "diamond" on anyone's finger could have come from "Imposters."

Undaunted by their lack of knowledge about gems, and without any further investigations, the officers went to the Kroger store and introduced themselves to Mrs. Thompson. They then went with her to the customer waiting area of the store's pharmacy. Thompson, the officers observed, was wearing a diamond ring on each hand. She was told she was not under arrest but that the officers believed that she was in possession of a "stolen" diamond. If she admitted "guilt," she was told she would not be arrested that day. The officers asked to take her rings which, they said, would be returned to her if they turned out not to be "stolen." Thompson then told the officers she wanted to call her husband. She rose from her chair and began to walk away when Wagner blocked her way. He and Gardner then secured her in handcuffs.

Gardner later testified that he believed Thompson was committing, or was about to commit, the crime of obstruction when she would not permit them to take the rings, said she was going to call her husband, and began to walk away. Wagner testified that he cuffed her because he suspected the diamond on her left hand was stolen and that she was going to conceal or destroy it if she left.

Thompson was upset, and she remained cuffed for about 5 to 10 minutes. When she calmed down, the cuffs were removed and she gave up the rings. But she remained in the officers' custody, again asking to call her husband. Wagner and Gardner then walked Thompson out of the store and placed her in their squad car. Thompson was in the squad car for about 10 minutes when her husband arrived. He signed a property receipt for the rings and Mrs. Thompson was released from custody. Although subsequent matters are not important on the issue before us, neither of the seized rings turned out to be the ones sold at the flea market.

This police encounter at her place of employment must have been embarrassing, for it prompted Mrs. Thompson to sue under 42 U.S.C. § 1983 alleging that her constitutional rights were violated. After some discovery, the district court granted summary judgment to the officers on qualified immunity grounds, a decision we review *de novo*. *White v. City of Markham*, 310 F.3d 989 (7th Cir. 2002).

We start with a few basics. The Fourth Amendment prohibits unreasonable searches and seizures. But a warrantless arrest is permitted under the Fourth Amendment if the arresting officer has probable cause. *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001) (citing *United States v. Watson*, 423 U.S. 411, 417-24 (1976)). Probable cause for an arrest exists if an officer reasonably believes, in light of the facts and circumstances within his knowledge at the time of the arrest, that the suspect has committed, or is committing, an offense. *See United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001). Arresting officers may draw reasonable inferences based on their training and experiences in determining whether suspicious circumstances rise to the level of probable cause. Whether probable cause exists "turns on the information known to the officers at the moment the arrest [was] made, not on subsequently received information." *Id.* (citing *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 2000)). Because the issue of whether probable cause for an arrest existed is linked to the determination of whether the arresting officers are shielded from liability by qualified immunity in a § 1983 action, the two issues are often analyzed together, and it makes good sense to do so in our case.

Qualified immunity shields police officers from liability for civil damages insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*

*v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defense of qualified immunity, however, is not available to "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

So, what this all boils down to is that the officers here are entitled to qualified immunity, and Thompson's § 1983 action against them must be dismissed without a trial if a reasonable officer could have believed that, in light of the facts and circumstances within the officers' knowledge and clearly established law, Mrs. Thompson had committed or was committing an offense. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991). A reasonable but mistaken belief that probable cause exists is sufficient for entitlement to qualified immunity. *Id.* at 227. In cases involving the issue of whether probable cause existed to support an arrest, "the case should not be permitted to go to trial if there is *any* reasonable basis to conclude that probable cause existed." *McDonnell v. Cournia*, 990 F.2d 963, 968 (7th Cir. 1993) (quoting *Cross v. City of Des Moines*, 965 F.2d 629, 632 (8th Cir. 1992)). So we see that in getting around the defense of qualified immunity in a probable cause to arrest situation, plaintiffs have a very difficult hurdle to pass. Difficult, but not impossible. We now get to the point.

Although Mrs. Thompson was told she was not under arrest when she went with the officers to the waiting area in the store's pharmacy, she was clearly arrested when the officers blocked her from leaving, cuffed her, and questioned her. She remained under arrest until she was released from the squad car. The whole episode, from what we can gather, appears to have taken about a half hour.

The officers are a bit inconsistent on just what they contend formed the basis for their arrest. Several possibilities are suggested. At one point they say they "mis-

takenly believed that one of the diamond rings which plaintiff was wearing was the diamond ring which had been sold at the flea market." So the basis for the arrest, this statement implies, was possession of stolen property or, more accurately, property acquired by fraud or deception, for Mr. Berry didn't sneak off with the rings; he took them after leaving bad checks as the consideration for the sale. But in the district court, the defendants emphasized another theory—the officers arrested Thompson for "obstruction" when she got up to leave, saying she was going to call her husband.

On the facts of this case, neither theory holds up. The "probable cause" theory has to fail because it was unreasonable to assume that probable cause existed. What the officers had was simply this: the statement, 5 months after the "crime," by a convicted felon who admittedly lied to them earlier in their investigation. Without even a modicum of additional investigation, we think a reasonable officer would not have believed he had probable cause to place Mrs. Thompson under arrest based on what Myers said in his second statement. Add to this what the officers didn't have—knowledge about diamonds—and we have more fuel to add to the fire of unreasonableness.

The "obstruction" theory also fails. Mrs. Thompson voluntarily went with the officers to the waiting area. She was told she was not under arrest. When she wanted to get up and go to call her husband, she had a right to do so. To hold otherwise would be to say that anyone who decides to terminate a voluntary conversation with a police officer commits a crime. It would not be reasonable—or consistent with the Fourth Amendment—for a police officer to hold this view.

Finally, Mrs. Thompson's cuffing and detention cannot be justified under *Terry v. Ohio*, 392 U.S. 1 (1968), as

the officers have made no attempt to say their actions were necessary for their own protection.

So, what we have here is a situation where the officers seem to have decided on their course of action before they even entered the Kroger store. If Mrs. Thompson had a diamond, and refused to give it up, she would be arrested. Without probable cause or a valid charge of obstruction, their actions cannot be protected by qualified immunity. It may well be that Mrs. Thompson is entitled to win on the liability issue, but the district court didn't rule on her motion for summary judgment. And we will not do so here. All we are saying at this time is that qualified immunity is not a valid defense in this case. The judgment of the district court is REVERSED and the case REMANDED for further proceedings consistent with this opinion.

A true Copy:

      Teste:

                    _____
                    *Clerk of the United States Court of Appeals for the Seventh Circuit*