In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2517

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FAUSTO LOPEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16-CR-169 — **Manish S. Shah**, *Judge.*

ARGUED JANUARY 16, 2018 — DECIDED OCTOBER 18, 2018

Before WOOD, *Chief Judge*, and ROVNER and HAMILTON,
*Circuit Judges*.

HAMILTON, *Circuit Judge*. Law enforcement officers detained and frisked defendant-appellant Fausto Lopez after observing him and his brother load paper bags into Lopez's garage. The officer who ordered the stop had a "hunch" that the bags contained drug-trafficking contraband. That hunch was wrong. It had been based on a tip the officers had ob-

tained the previous night from an informant detained for suspected drug trafficking. The informant stopped cooperating with the officers as soon as he was out of their sight.

After finding no contraband, the officer who had ordered the stop realized that his hunch had been mistaken. Nevertheless, eight officers continued to detain Lopez. At one point during this detention, the lead officer told Lopez that he was "free to go." Yet the officers kept possession of Lopez's cellphone and keys, effectively restraining his liberty to leave and stripping the assurance of meaning. While Lopez was still detained, the officers eventually obtained his permission to search his house based on another hunch that Lopez kept drugs there. This second hunch proved correct. Officers recovered drugs and a gun from the home. A grand jury indicted Lopez for illegal possession of the heroin and illegal possession of a firearm. Lopez moved to suppress the evidence, arguing that it had been obtained by violating his Fourth Amendment right to be free from unreasonable searches and seizures. The district court denied his motion, and Lopez then pleaded guilty to both charges while reserving the right to appeal the denial of his motion to suppress.

We reverse the denial of the motion to suppress for two independent reasons. First, when the officers seized and searched Lopez, they did not have a reasonable suspicion that he was engaged in crime. Second, even if the original stop had been justified, the officers continued detaining Lopez beyond the original justification for the stop. Either violation was sufficient here to undermine the validity of Lopez's eventual consent to the search of his house.

I.  *Factual and Procedural Background*

  A.  *The Tip*

On February 10, 2016, law enforcement officers were conducting surveillance in a narcotics investigation in Chicago. They stopped a man whom they observed enter a business. The officers searched his car and apartment but found no drugs or paraphernalia. Only after officers found drugs in a neighboring apartment did the man confess that he transported drugs for a trafficking organization. The man drove with the officers to a house on South Laflin Street in Chicago where he said he had previously received drugs, and he explained the mechanics of the typical transaction.

He told the officers he would receive a telephone call and then pick up a white Chevrolet Malibu from a parking lot. The informant said he would then drive that car into a residential garage located on South Laflin. In the garage, a man named "Fausto" would take money out of the Malibu and replace it with cocaine. The informant would then drive the car back to the parking lot and leave it there. Although he claimed to have run this operation about five times, the informant did not provide the police with information about the most recent transaction or any information about the frequency or schedule of these exchanges.

After the informant provided this information, the officers let him go. He then stopped communicating with law enforcement and rebuffed their efforts to contact him. Even without further cooperation, the officers acted on the tip immediately.

B. *The Stop, Frisk, and Eventual Search*

By the next day, the police confirmed that a man named Fausto Lopez lived at the South Laflin address, obtained a picture of Lopez, and put his home and garage under surveillance. Later that same day, the officers saw a white van pull up to Lopez's garage and saw two men get out of the van with paper shopping bags. An officer recognized Lopez from the photograph and had a "hunch" that the bags contained contraband. The officers watched Lopez get back inside the van and drive out of the garage and down the alley. The other man, who turned out to be Lopez's brother, stayed in the garage. Lopez was seized on the basis of only the information described thus far. As Lopez drove his van down the alley, two vehicles blocked him in with their emergency lights activated. An officer ordered Lopez out of the van and immediately frisked him. Finding no weapons, the officer asked Lopez for permission to search his vehicle. Lopez consented. The officers found no drugs, drug paraphernalia, or weapons.

Despite finding no contraband, the police took possession of Lopez's van, car keys, and cellphone. Two officers escorted Lopez back to the garage on foot. By the time Lopez arrived at his garage, another group of officers had stopped his brother there for questioning. All told, at least eight law enforcement officers had crowded into or around Lopez's garage by the time police began to question him there.

The lead officer told Lopez that the police were doing an investigation but cautioned that he was not under arrest and did not have to answer the officers' questions. The officer also told Lopez he was free to go. Still, since Lopez was already at home and the officers had taken possession of his van, his car keys, and his cellphone, it is hard to see what practical effect

this assurance might have had. The officer then asked Lopez if the garage contained drugs, guns, or large amounts of money. Lopez said no. The officer then asked Lopez for permission to search the garage. Lopez consented, and the officers searched the garage, including the paper shopping bags that the brothers had just carried in. The search turned up nothing—no drugs, no guns, no money, and no related paraphernalia.

Yet the lead officer continued to question Lopez, and the officers still kept his car keys, cellphone, and van. The same lead officer repeated the bland assurance that Lopez was not under arrest before asking him if he had guns, drugs, or large amounts of money in his house. Lopez again said no. The officer then asked Lopez "if it was okay if [the officers] went into the house and searched for those items that [Lopez] said he didn't have." Lopez said yes, and the officers escorted him to his home before searching it. Once inside, the officers searched the house. They found a large amount of cash in Lopez's bedroom. An officer questioned Lopez about the money, and he directed the officers to heroin stored in his kitchen and basement and to a gun in his bedroom.

C. *The Prosecution*

A grand jury indicted Lopez for possession of heroin with intent to distribute under 21 U.S.C. § 841(a)(1) and under 18 U.S.C. § 922(g)(5)(A) for possession of a firearm by an alien in the United States unlawfully. Lopez moved to suppress the evidence found in the search. After an evidentiary hearing, the district court determined that the search of Lopez's house did not violate the Fourth Amendment. The district court found first that the officers had reasonable suspicion that authorized their investigative stop of Lopez and then that the

officers' searches of Lopez's garage and house were lawful be-
cause Lopez had voluntarily consented to them. The court
found that the officers had not read Lopez his *Miranda* rights
but that the warnings were not necessary since Lopez was not
in custody. The court based this finding primarily on the lead
officer's statements that Lopez was not under arrest, could
leave at any time, and need not answer questions. The court
found that the officers' frisk of Lopez was unlawful, but the
court determined that the unlawful frisk did not taint Lopez's
later consent to search the house.

After the district court denied his motion to suppress,
Lopez pleaded guilty under a conditional plea agreement that
reserved his right to appeal the court's ruling on suppression.
Lopez was sentenced to 120 months in prison.

II.  *Analysis*

We review *de novo* the district court's determination of rea-
sonable suspicion. *Ornelas v. United States*, 517 U.S. 690, 699
(1996). We review for clear error the court's underlying factual
findings. *Id.*; *United States v. Johnson*, 867 F.3d 737, 741 (7th Cir.
2017). The finding that Lopez voluntarily consented to the
search is a factual finding that we review for clear error.
*United States v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018), cit-
ing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

The Fourth Amendment to the Constitution prohibits un-
reasonable searches and seizures. Lopez was seized without a
warrant or probable cause, but he could have been seized
briefly but lawfully under *Terry v. Ohio*, 392 U.S. 1, 27 (1968),
if the officers had a reasonable suspicion that he was engaged
in criminal activity. The search of Lopez's house was carried
out without a warrant, but if he voluntarily gave consent to

the search, the search would also have been lawful. *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991), citing *Schneckloth*, 412 U.S. at 219.

Because *Terry* stops are made without warrants, they are subject to limits. Two are important here. First, officers may carry out a *Terry* stop only when they "have a reasonable suspicion, grounded in specific and articulable facts" that an individual has committed a felony or is about to commit a crime. *United States v. Hensley*, 469 U.S. 221, 229 (1985). The reasonable suspicion standard is a lower bar than the probable cause standard necessary for an arrest, see *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002), but the police are not entitled to detain a person for questioning based on only a hunch. *Terry*, 392 U.S. at 22; *United States v. Wimbush*, 337 F.3d 947, 949–50 (7th Cir. 2003).

Second, since the "Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation," the lower bar governing *Terry* stops requires that the scope of these stops be narrower than situations justified by probable cause. *Terry*, 392 U.S. at 28–29. More specifically, a *Terry* stop violates the Constitution when an officer "prolongs the stop, absent the reasonable suspicion ordinarily demanded" by the Fourth Amendment. *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). When the reasonable suspicion justifying the stop evaporates, the stop must end.

What we blandly call "*Terry* stops" can be highly intrusive. When combined with a frisk—as happened here—a *Terry* stop first deprives a person of liberty and then involves "a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons … performed

in public by a policemen while the citizen stands helpless, perhaps facing a wall with his hands raised." *Terry*, 392 U.S. at 16–17. That's not just "a 'petty indignity,'" wrote the Supreme Court, but "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Id.* at 17.

With the authority to stop comes the authority to require the subject to submit to the stop, and to use reasonable force to make him submit. *United States v. Place*, 462 U.S. 696, 702 (1983) (*Terry* implicitly acknowledged authority of police to make forcible stop based on reasonable suspicion); *Adams v. Williams*, 407 U.S. 143, 146 (1972) (upholding forcible stop based on tip from reliable informant). Such situations can escalate quickly to violence and even death. See, e.g., *Tom v. Voida*, 963 F.2d 952, 954 (7th Cir. 1992) (no constitutional violation where attempt to make justified *Terry* stop led to officer fatally shooting subject); *Brown v. City of Milwaukee*, 288 F. Supp. 2d 962 (E.D. Wis. 2003) (*Terry* stop based on mistaken identification resulted in permanent injuries and pain).

We analyze the stop, frisk, and searches here in three steps. We first find in Part II-A that the officers did not have a reasonable suspicion to support the initial stop of Lopez. In Part II-B, we explain why we agree with the district court that the officers did not have grounds to frisk Lopez. In Part II-C, we conclude that even if the initial stop had been justified, the officers prolonged the stop beyond any justification. The original unjustified stop and the prolonged detention, together or independently, were enough to undermine the claim that Lopez's consent to the search of his house was voluntary.

A.  *The Basis for the Initial Stop*

The "central inquiry" in determining whether a *Terry* stop is legal focuses on "the reasonableness in all the circumstances of the particular governmental invasion" of a person's "personal security." *Terry*, 392 U.S. at 19. Courts must consider the "'totality of the circumstances' of each case. . . ." *Arvizu*, 534 U.S. at 273. In practice, the totality-of-the-circumstances test for reasonable suspicion operates in much the same way as the test for probable cause, though adjusted to the less demanding standard. See *Terry*, 392 U.S. at 20–21 (explaining the facets of the reasonable suspicion inquiry and noting that "the notions which underlie both the warrant procedure and the requirement of probable cause remain fully relevant in this context"). The Supreme Court has cautioned against creating any "rigid demand" based on "relevant considerations in the totality-of-the-circumstances analysis," noting that "a deficiency in one may be compensated for … by a strong showing as to the other." *Illinois v. Gates*, 462 U.S. 213, 231, 233 (1983). The many cases applying *Terry* to police stops provide substantial guidance in deciding when informants' tips and police efforts to corroborate the tips do or do not support reasonable suspicion.

In this case, the officers stopped Lopez based on information from the disappearing informant and their observation of Lopez and his brother as they unloaded paper bags into Lopez's garage. Our analysis, therefore, begins with the tip. When courts review *Terry* stops based on tips, they must consider the identity of the informant. See *Florida v. J.L.*, 529 U.S. 266, 271 (2000) (anonymous tip cited as justification for a *Terry* stop lacked sufficient "indicia of reliability"—it "provided no predictive information and therefore left the police

without means to test the informant's knowledge or credibility"); *Adams v. Williams*, 407 U.S. 143, 146–47 (1972) (tip from *known* informant "carried enough indicia of reliability" to justify an "officer's forcible stop"). In the run of cases, informant identities exist along a spectrum of knowledge and reliability that affects the reasonableness of police action taken pursuant to the tip. At one end of that spectrum, officers receive a tip from a known, trusted, and reliable source. At the other end, officers receive an anonymous tip without signs of reliability.

The Supreme Court's decisions in this area "have consistently recognized the value of corroboration of details of an informant's tip by independent police work." *Gates*, 462 U.S. at 241. The degree of corroboration required before police may deprive a person of liberty, even briefly, depends on the reliability of the tip's source. See *J.L.*, 529 U.S. at 271 ("The tip in the instant case lacked the moderate indicia of reliability present in … and essential to the Court's decision" in *Alabama v. White*, 496 U.S. 325 (1990), which held that the anonymous tip in question "exhibited sufficient indicia of reliability to provide reasonable suspicion to make the [relevant] investigatory stop."). We begin by comparing cases with tips from reliable sources and cases with tips from anonymous sources. We then examine the tip in this case, where the police knew the identity of the informant but had no information indicating he was reliable or truthful.

Tips that come from more trustworthy sources will require less independent corroboration than those obtained from more questionable sources. For example, in *Adams v. Williams*, the Supreme Court held that a *Terry* stop based on an informant's tip was justified with little verification because the officer received the tip from an informant who "was

known to him personally and had provided him with information in the past." 407 U.S. at 146. The informant approached the officer and told him that "an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist" *id.* at 145, while "in a high-crime area at 2:15 in the morning." *Id.* at 147. Acting on the tip, the officer approached and ordered Williams to exit the car. Williams disobeyed the order, and the officer reached inside the car and grabbed a gun from Williams's waistband. Given the specific information from a reliable informant and the potential danger to the officer, the Supreme Court found that the seizure was justified, and that it simultaneously corroborated the tip. *Id.* at 147–48. The Supreme Court found no Fourth Amendment violation. *Id.* at 149.

Anonymous tips, by contrast, require more verification before police may execute a stop and deprive a person of liberty. "Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized." *Adams*, 407 U.S. at 147. Before law enforcement may stop a person based on an anonymous tip, reasonable suspicion typically "requires that [the] tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272. Absent verification of illegal conduct alleged in a tip, police acting on anonymous tips must verify details not easily ascertained by public observation or "future actions of third parties ordinarily not easily predicted." *Gates*, 462 U.S. at 245. Prediction of future behavior without corroboration will not alone render an anonymous tip reliable. See, e.g., *White*, 496 U.S. at 332 (upholding *Terry* stop based on detailed anonymous tip about future drug

transaction, but taking care to distinguish between information, on one hand, that "[a]nyone could have 'predicted'" based on public observation, like the location of a vehicle in a parking lot, and information, on the other hand, showing the informant's "ability to predict" White's "*future behavior*").

In *Illinois v. Gates*, the Supreme Court emphasized the importance of corroborating an anonymous tip's prediction of future behavior. In *Gates*, the Supreme Court found no Fourth Amendment violation where the police verified details in a tip before stopping a husband and wife and searching their house and car on the belief that they trafficked drugs between Florida and Illinois. 462 U.S. at 246. Although *Gates* involved probable cause as opposed to reasonable suspicion (the officers obtained a warrant), its guidance on anonymous tips is useful when considering *Terry* stops as well. In *Gates*, an anonymous informant had told police that Sue Gates would drive to Florida on May 3 to have her car loaded with drugs and that her husband Lance would fly to Florida soon afterward to drive the car back to the couple's home in Illinois. *Id.* at 225. Police obtained a warrant to search the Gateses' home and vehicle after verifying that Lance Gates would fly to Florida on May 5 and observing him enter a motel room registered to his wife before driving his car to a highway bound for Illinois. *Id.* at 226.

The Supreme Court found no Fourth Amendment violation because "the *modus operandi* of the Gateses had been substantially corroborated" by independent police work, *id.*, and because the police had corroborated that the tip accurately described the Gateses' future actions that were "not easily predicted." *Id.* at 245. The Court reasoned that "if the informant

could predict with considerable accuracy the somewhat unusual travel plans of the Gateses," then the law was justified in detaining them and searching their house and car. *Id.* at 245–46 n.14.

In contrast to these cases allowing stops and searches based on tips, *Florida v. J.L.* held that a *Terry* stop violated the Fourth Amendment because police had not sufficiently verified an anonymous tip. *J.L.*, 529 U.S. at 274. The informant called police and said that a black youth wearing a plaid shirt and standing at a particular bus stop was carrying a gun. *Id.* at 268. Police officers matched J.L.'s appearance to the information in the tip and stopped and frisked him and found a gun. *Id.* The Court rejected Florida's contention that "the tip was reliable because its description of the suspect's visible attributes proved accurate[.]" *Id.* at 271. Instead, the Court held that the Fourth Amendment required the police to investigate "predictive information … to test the informant's knowledge or credibility[,]" *id.*, to determine that the tip is "reliable in its assertion of illegality, not just in its tendency to identify a determinate person" before police may intrude on a person's liberty. *Id.* at 272.

In this case, officers knew the informant's identity but nothing else. Without corroborating any incriminating or predicted information, and without knowing anything about the informant's reliability, they seized Lopez and deprived him of his liberty. When officers know the bare identity but little else about an informant, they still must conduct and rely upon independent investigation to corroborate a tip before seizing a person. In this case, police corroborated only the name-and-address match for Fausto Lopez—"easily obtained facts" that "[a]nyone could have 'predicted.'" *White*, 496 U.S. at 332.

They verified no facts that would indicate the tip was "reliable in its allegation of illegality," as required by *Florida v. J.L.* 529 U.S. at 272.

In evaluating this case, we must not blur the distinction between an anonymous informant and one whose bare identity is known to law enforcement. But we also must avoid blurring the distinction between a known, trustworthy informant and the informant in this case. On the spectrum of tipster reliability, this informant's disappearance and ultimate refusal to cooperate with law enforcement place him closer to the unverified anonymous caller than to the known, trustworthy source. In this situation, the reasonable-suspicion standard requires police to verify at least some facts supporting the informant's allegation of criminal activity before seizing the subject of the tip. See *Thompson v. Wagner*, 319 F.3d 931, 935–36 (7th Cir. 2003); *United States v. Ienco*, 182 F.3d 517, 524 (7th Cir. 1999). The officers here did not do such verification before they detained Lopez against his will.

This approach finds support in our cases involving identified but unproven informants. See, e.g., *Thompson*, 319 F.3d at 936; *Ienco*, 182 F.3d at 521 (finding no reasonable suspicion for a *Terry* stop where "the very officer whose reasonable suspicion, if extant, could have permitted a *Terry* stop acknowledged that he had no basis other than a hunch to suspect" criminal conduct by the men stopped). In particular, in *Thompson v. Wagner*, police investigated stolen diamond rings. A co-conspirator in the case told police that a diamond from one of the stolen rings could be found in the wedding ring worn on the left hand of Beverly Thompson. 319 F.3d at 933. This fact came wrapped in a story detailing a series of exchanges and trades for the diamond, including one exchange

where Thompson's husband obtained the gem by trading his car to his sister, who had received the original diamond ring from the informant, who was her boyfriend. *Id.*

The officers visited Thompson in the grocery store where she worked "without any additional investigation on their part" into any other aspects of the story, including whether Thompson's sister-in-law had recently received a car or whether any of the traded rings matched the stolen ring. *Id.* at 934. The officers corroborated from the detailed tip only that Beverly Thompson worked at the grocery store and that she wore a ring on her left hand. Approaching Thompson, the officers told her "she was not under arrest but that the officers believed that she was in possession of a 'stolen' diamond." *Id.*

Thompson told the officers she wanted to talk to her husband and rose to make a call. The officers then detained and arrested her because they believed that she "was committing, or was about to commit, the crime of obstruction" and because they "suspected the diamond on her left hand was stolen and that she was going to conceal or destroy it if she left." *Id.* Based on the officers' failure to undertake "even a modicum of additional investigation" to corroborate the informant's story, however, we held that the officers had violated Thompson's Fourth Amendment rights and were not justified under *Terry*. *Id.* at 936.

The initial seizure of Lopez fell short of the Fourth Amendment's requirements for *Terry* stops. Remember the facts in the tip: The informant said that during a typical transaction he drove a white Chevrolet Malibu into the garage, and the exchange of drugs for money took place inside the garage after closing the door. On the day of the seizure, however, the police observed a white van pull up next to the garage while

the brothers exited the vehicle and unloaded paper bags into the garage from the alley. No courier; no white Malibu or similar vehicle; no concealing the vehicle inside the garage to avoid witnesses. The officers' observations that day simply did not corroborate, even roughly, the informant's story. The officer who decided to stop Lopez could only guess what was in the bags Lopez carried—he operated on no more than a hunch. He and his fellow officers failed to undertake "even a modicum of additional investigation" to see if the Lopezes' or others' actions matched the informant's tale or to wait for Lopez's actions to create an independent basis for reasonable suspicion.

Instead of doing the police work required to substantiate the tip, the officers pounced as soon as they saw Lopez leave his garage. They had seen conduct that did not corroborate the tip or provide an independent source of reasonable suspicion. The officer who observed Lopez himself agreed that Lopez and his brother did not do "anything at all to secrete the activity" and "[d]idn't try to hide it in any way."

Requiring police to corroborate tips from identified but unproven informants is an important protection of individual liberty, and it finds support in other circuits. In *United States v. Roch*, a known informant told police that a suspected man named Frank had two guns, drove a white and orange pickup truck, was staying at a specific motel, and "planned to pass some forged checks and [had] threatened to kill the next cop he saw." 5 F.3d 894, 896 (5th Cir. 1993). The officers watched the motel until the truck exited the parking lot. They stopped the defendant at a nearby gas station and discovered firearms in his truck. The government charged the defendant with being a felon in possession of a firearm. The Fifth Circuit held

that the *Terry* stop leading to Roch's arrest violated the Fourth Amendment. *Id.* at 899. The court explained that the "agents did not see Roch commit a criminal offense, engage in any questionable behavior, or break any traffic laws. The only activity the agents observed was a man and woman leaving a motel parking lot in a[] white and orange pickup truck, and driving to a filling station." *Id.* at 897–88. The officers "could corroborate that a white man was driving a white and orange truck" from the identified motel, but in their investigation they did not observe "sufficient details that corroborate the informant's tip." *Id.* at 899. Based on this failure to substantiate the informant's story, the court found that the tip lacked "sufficient indicia of reliability" even though the police "knew the informant personally[.]" *Id.* at 898.

In *United States v. Martinez*, the Fifth Circuit again found a Fourth Amendment violation based on the inadequacies of a tip from a confidential informant relied upon to justify a *Terry* stop. 486 F.3d 855, 861 (5th Cir. 2007). Other circuits have come to similar conclusions. See, e.g., *Bazzi v. City of Dearborn*, 658 F.3d 598, 605 (6th Cir. 2011) (no reasonable suspicion where known informant alleged target of *Terry* stop had guns and drugs and "accurately described [target's] vehicle and its location," but "there was no corroborating evidence of the otherwise unreliable assertion that [the target] possessed guns and drugs."); *United States v. Brown*, 448 F.3d 239, 249 (3d Cir. 2006) ("borrow[ing] underlying principles from the anonymous tip context to evaluate the reliability of … tip" from a known but unproven informant to find no reasonable suspicion where tip identified robbery suspects but lacked sufficient indicia of reliability).

To counter this authority and reasoning, the government relies on the fact that in this case, the identified informant's statements were against his penal interest. The government argues that the incriminating nature of the informant's tip provided strong, or at least sufficient, evidence that the tip was reliable. The government is right that our cases and a plurality of the Supreme Court in *United States v. Harris* have acknowledged that statements against penal interest "carry their own indicia of credibility" because people are unlikely to fabricate information that puts them at legal jeopardy. 403 U.S. 573, 583 (1971) (plurality opinion). At the same time, however, the *Harris* plurality cautioned, in terms that apply here, that "admissions of crime do not always lend credibility to … accusations of another." *Id.* at 584. A participant in a criminal enterprise may well have incentives to misdirect the police away from his real confederates. Instead, the fact that an informant's statement is against his penal interest merely serves as one factor in the totality of the circumstances analysis. See *Gates*, 462 U.S. at 233-34 (rejecting rigid rules in that analysis, including treating reliability and basis of knowledge as independent criteria).

In this case, the informant's statement against his own penal interest does not outweigh our other concerns about the officers' too-hasty actions to seize the person who was the subject of the tip. Turning to other factors in the totality-of-the-circumstances analysis, the informant here ceased cooperating with police the moment he left their presence. That turn of events provided ample reason to think the informant was not standing behind the story he told police and thus undermined his reliability.

The police here strayed from the hallmark justifications of *Terry* stops. No urgent circumstances excused the officers from abandoning the Fourth Amendment's warrant requirement, which must be observed "whenever practicable." *Terry*, 392 U.S. at 20. Neither the officers' observations nor the information in the tip called for "necessarily swift action … which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Id.* And the officers did not confront a situation "where police have been unable to locate a person suspected of involvement in a past crime" — they identified Lopez the day after receiving the tip. *Hensley*, 469 U.S. at 229. Instead, these facts fall squarely within those situations where the Fourth Amendment demands that police either try to obtain a warrant or wait until they observe conduct requiring, or at least suggesting a need for, immediate action.

To allow the stop of Lopez to withstand Fourth Amendment scrutiny would enable police to use the unsubstantiated statement of almost anyone to justify a *Terry* stop of any person whose mere name and address are known to the tipster. People under police investigation themselves could too easily deflect suspicion by redirecting law enforcement's attention to others. If an unreliable and uncorroborated tip were enough to justify an immediate move to seize and question the subject, we would be restricting everyone's liberty based on the optimistic hope that those who name names during interrogation do so in good faith. The reasonable-suspicion threshold sets a lower bar for state action than probable cause, but that bar has not slipped so low as to allow unreliable tips like this one to trigger the humiliating, involuntary seizures and sometimes violent encounters that we justify under the bland and familiar phrase "*Terry* stops."

The government has marshaled several of our cases to support the initial seizure of Lopez here. Most are inapposite because they involved an officer's own observations, ongoing emergencies, or ongoing crimes. *United States v. Ruiz*, 785 F.3d 1134, 1141–42 (7th Cir. 2015) ("officers had observed a series of suspicious encounters" consistent with drug trafficking); *United States v. Hicks*, 531 F.3d 555, 558 (7th Cir. 2008) ("ongoing emergency" in domestic disturbance); *United States v. Brown*, 366 F.3d 456, 460 (7th Cir. 2004) (defendant's "participation in the crime" of robbery "was still ongoing").

The Supreme Court has instructed that investigative stops related to completed crimes must be distinguished from investigative stops related to ongoing or imminent crimes because the governmental interest in preventing and stopping crimes and threats to public safety is more attenuated once a crime has been completed. Because Fourth Amendment law "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion . . . [t]he factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct." *Hensley*, 469 U.S. at 228. Consequently, we reject the application of those cases involving urgent situations to the cold surveillance involved here. Although this case apparently involved an ongoing conspiracy, it did not involve moment-to-moment or hour-to-hour criminal acts by Lopez. Under the government's theory, however, police could have seized Lopez anytime and anywhere, based on this unreliable and uncorroborated tip.

In citing *United States v. Lake*, the government presents a case with superficially similar facts. In that case, the police received a tip from a known informant. 500 F.3d 629, 631 (7th Cir. 2007). Acting on the tip, the police found drugs and a gun at the defendant's apartment. At the suppression hearing, the informant refused to cooperate, though the government presented evidence that the informant's reluctance came after he was beaten for providing the initial tip. *Id.* at 631–32. Nevertheless, we found law enforcement had probable cause to search the apartment. *Id.* at 633.

The key distinguishing fact is that the officers in *Lake* followed the proper warrant procedure after receiving the tip. *Id.* at 631. The state-court judge who issued the warrant listened to testimony under oath from the reluctant informant as well as the three officers. *Id.* As we have stressed, the officers who stopped Lopez acted without a warrant, and there were no exigent circumstances. If *Lake* has any relevance to this case at all, it is to emphasize the importance of following the warrant procedure whenever practicable.

B.  *The Frisk*

Even when a *Terry* stop is justified, whether a frisk is also justified is a separate question. *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009); *United States v. Thompson*, 842 F.3d 1002, 1007 (7th Cir. 2016). We agree with the district court that the officers violated the Fourth Amendment here by frisking Lopez as part of the stop, even if the stop itself had been justified. The government contests this holding in a footnote by pointing to cases where we have found frisks of suspected drug dealers constitutional because "guns are known tools of the drug trade." U.S. Brief at 22 n.3, citing *Thompson*, 842 F.3d at 1007**;**

accord, *United States v. Askew*, 403 F.3d 496, 507-08 (7th Cir. 2005).

The authority to frisk is not automatic in a drug investigation. For a frisk to be lawful, it must be based on reasonable suspicion that "criminal activity may be afoot and that the persons with whom [the officer] is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30.  Those conditions were not present in this case, where police observed nothing indicating a potentially dangerous drug transaction. But more fundamentally, since the stop was improper, the frisk was too.[1]

C.  *Length of the Stop*

Even if the initial stop had been justified, it lasted too long. A *Terry* stop may "last no longer than is necessary to effectuate" its purpose. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015), quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). "A person stopped on reasonable suspicion must be released as soon as the officers have assured themselves that no skullduggery is afoot. Probable cause, by contrast, justifies a custodial arrest and prosecution, and arrests are fundamentally different from *Terry* stops." *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (en banc).

In this case, the officers clearly extended the stop beyond the time necessary to complete any investigation based on the

---

[1] The district court found that any taint from this violation did not affect Lopez's ability to consent voluntarily to the search of his home. We need not consider the effects of the frisk in isolation since we find also that the initial stop and, as we explain next, the prolonged detention of Lopez contributed to an inherently coercive setting. But we are confident that the unjustified frisk contributed to the coercive setting.

claimed reasonable suspicion. There was not a sufficient justification for the *Terry* stop in the first place, but even that inadequate justification evaporated when the officers looked inside the paper bags in the garage. Even if the officers had speculated that Lopez's brother might have replaced drugs in the bags with car parts, that suspicion would have disappeared when they searched the garage. The officers stopped Lopez and his brother immediately after his brother entered the garage and Lopez began to drive away. Because the elapsed time between observation and detention was so short, it would have been impossible for the Lopez brothers or anyone else to have spirited drugs from the shopping bags into the house.

This case presents a wrinkle not present in *Rodriguez v. United States*, where the police search occurred after the defendant had refused the officers' request to conduct the search. 135 S. Ct. at 1613. Here, by contrast, Lopez consented to the search. So one might think that a person's consent to a search might absolve the officers' illegal extension of the search. To the contrary, "[q]uestioning that prolongs the detention, yet cannot be justified by the purpose of such an investigatory stop, is unreasonable under the fourth amendment." *Childs*, 277 F.3d at 952, citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

The question does not depend on exactly how many minutes the stop lasts. It depends on whether law enforcement has detained the person longer than needed to carry out the investigation that was justified by the reasonable suspicion. See *United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005) ("the unlawful seizure was ongoing when Johnson voiced his consent, foreclosing the possibility that the consent was sufficiently attenuated from the unlawful conduct as to

purge the taint"); *Childs*, 277 F.3d at 952. So when an officer acts expeditiously but is delayed waiting for the arrival of a drug-sniffing dog or other investigative resources, a 20-minute stop could be justifiable. At the same time, a 15-minute stop would be too long if the investigation justifying the stop finished at the 14-minute mark.

The government argues that the stop here was not excessively long because, when the officer asked Lopez for permission to search his house, he was no longer being detained by police and was free to leave. The officer had told Lopez "that he was not under arrest, that he didn't have to speak" to officers, and that "he was free to go." In assessing whether a person has been seized, we look to the totality of the circumstances and ask whether "a reasonable person would feel free to terminate the encounter." *United States v. Drayton*, 536 U.S. 194, 201 (2002). Similar facts were present in *Florida v. Royer*, where the Supreme Court held that the defendant's consent to search his luggage was obtained impermissibly because the officers had unreasonably detained him beyond the scope of the initial stop by keeping him in an enclosed space while retaining his identification and plane ticket. 460 U.S. at 503–04.

Similarly here, while one officer was assuring Lopez that he was free to go, the other officers still had Lopez's keys, van, and cellphone. At least eight officers remained on the scene at his garage and house. In this case, no reasonable person in Lopez's shoes would conclude that one officer's words meant more than all eight officers' actions. Lopez remained in police detention for as long as officers functionally blocked his exit by the overwhelming physical presence of eight officers and by retaining his van, car keys, and cellphone. This detention violated the limited scope of intrusion that would have been

permissible even if there had been reasonable suspicion for a *Terry* stop.

Since Lopez was being detained in violation of the Fourth Amendment, his consent to search the house cannot be deemed voluntary. No time had elapsed, there were no intervening circumstances, and the detention was not even arguably justified after the search of the garage turned up nothing incriminating. See *Royer*, 460 U.S. at 501; *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975) (considering voluntariness of statements provided after an arrest made without warrant or probable cause); *Johnson*, 427 F.3d at 1056–57; *United States v. Jerez*, 108 F.3d 684, 695 (7th Cir. 1997) ("Because the seizure was not supported by reasonable suspicion . . . [it] therefore vitiated the subsequent consent to search"). The evidence obtained pursuant to the search of the house may not be admitted as evidence against Lopez.

We REVERSE the denial of Lopez's motion to suppress and REMAND the case for further proceedings where Lopez may withdraw his guilty plea that was conditioned on the admissibility of the evidence against him obtained through the unlawful seizure and searches.