2021 IL App (2d) 200045-U
No. 2-20-0045
Order filed June 11, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-2495 |
| WILLIAM LANGE, | ) ) | Honorable John J. Kinsella, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Zenoff and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in denying defendant's motion to suppress and his motion to dismiss the indictment or transfer the case. Therefore, we affirm.

¶ 2    Following a stipulated bench trial, defendant, William Lange, was convicted of possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(D) (West 2016)) and sentenced to 15 years' imprisonment. On appeal, defendant argues that the trial court erred in denying his (1) motion to suppress evidence, and (2) motion to dismiss the indictment or transfer the case based on improper venue. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4      On November 17, 2017, defendant was charged by indictment with possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(D) (West 2016)) and possession of a controlled substance (720 ILCS 570/402(a)(2)(D) (West 2016)). The first charge alleged that on September 13, 2017, defendant knowingly possessed more than 900 grams of cocaine with the intent to deliver, and the second charge alleged simple possession.

¶ 5      Defendant filed a motion to suppress on July 3, 2018. He alleged that he was unlawfully seized, was not given *Miranda* warnings, and did not consent to a search of his vehicle or the seizure of property therein.

¶ 6      A hearing on the motion to suppress took place on November 30, 2018; the testimony from this hearing was later submitted as evidence for a stipulated bench trial. We summarize the testimony presented. During the first half of August 2017, Agent Matt Kampman of the Department of Homeland Security (DHS) obtained a phone tip from a "confidential informant" who said that an approximately 70-year-old Hispanic man named Victor was involved in narcotics trafficking and money laundering, and that "he was moving bricks or a lot of weight." The informant provided a specific address for the man in Melrose Park. Kampman had worked with the informant five to eight times before, and he was very reliable. The informant's tips and information had "almost always" led to the seizure of large amounts of narcotics or currency; Kampman estimated that this had occurred five to eight times as well. In the past, the informant had obtained information from hearing it from others, and also "he would be able to be transactional in situations." In the instant case, the informant provided a general tip and did not personally know the man.

¶ 7      In addition to Kampman, Agent Michael Potapczak was assigned to the case. From the informant's tip, they were able to determine that the man living at the residence was Victor Salinas.

His date of birth corresponded to the approximate age provided by the informant. A criminal background check revealed that Salinas had been arrested for unlawful delivery of a controlled substance in 1980, and in 1999 he was a suspect in a drug trafficking organization investigation. They were able to view a photograph of Salinas from his driver's license record.

¶ 8 The agents had multiple targets in Melrose Park and drove by Salina's house on some occasions but did not see a vehicle. On those days, they had shifted their attention to targets of other investigations. However, on September 13, 2017, at about 6 a.m., they saw a vehicle at Salinas's residence and therefore began conducting surveillance there. They were in separate unmarked vehicles and wearing plain clothes, but they had badges and weapons. About 15 minutes later, Salinas exited the residence with a black shopping bag and got into a Chevy Malibu. They followed Salinas, who drove from the residence in Melrose Park, which was in Cook County, through a part of Du Page County, to an IHOP restaurant in Schaumburg, which was in Cook County. Salinas parked and entered the restaurant without the bag. They observed him through a window sitting in a booth, and defendant subsequently joined him at about 7 a.m.

¶ 9 Salinas and defendant left after about 30 to 45 minutes, at about 7:38 a.m., and began walking to their respective vehicles. Defendant entered his car. Salinas then pulled his vehicle up to the passenger-side of defendant's vehicle. While Salinas was parking, defendant exited his car and was in and out of the passenger side rear door and passenger side front door of his vehicle. He retrieved a large white FedEx envelope from his vehicle and handed it to Salinas through Salinas's open driver's-side window. The envelope appeared full and heavy. Salinas then handed defendant the black shopping bag that the agents had previously observed, and defendant placed the bag in his vehicle's trunk.

¶ 10    Potapczak and Kampman then pulled their respective vehicles behind Salinas's and defendant's vehicles to prevent them from being able to leave. Potapczak approached Salinas's passenger-side window with his hand on his weapon, yelled "Police," and told Salinas to turn off the car and put the keys on the passenger seat. Salinas complied. Potapczak explained that they had been following him and told Salinas what he had observed; he did not give Salinas *Miranda* warnings. Potapczak asked Salinas what was in the bag that he handed to defendant, and Salinas said three "bricks." "Brick" was a term that referred to a kilogram of narcotics. Potapczak asked Salinas what was in the white envelope, and Salinas said that it contained money. Potapczak asked how much, and Salinas replied that he did not know the exact amount. Potapczak relayed this information to Kampman.

¶ 11    Potapczak had Salinas exit the car, searched him, and asked for permission to search the vehicle. The search revealed that the FedEx envelope contained about $39,000 cash. Salinas was handcuffed and transported to a field office, where he was given *Miranda* warnings. He later consented to a search of his residence, which revealed additional cocaine and cash.

¶ 12    Meanwhile, when Kampman was initially pulling his vehicle behind defendant's vehicle, defendant exited his car. Kampman got out, put his hand on his side pistol, and said, " 'Police. Don't move. Let me see your hands.' " The gun was out of the holster for one minute or less, and Kampman put it away when he saw that defendant was cooperative and not aggressive. Kampman patted defendant down and then told him that the agents had been conducting surveillance and had seen the bag exchange. He did not give defendant *Miranda* warnings. He asked if defendant had any contraband in the car like drugs, money, or guns, and defendant answered in the negative. Kampman asked if he could search the car, and defendant told him to go ahead. Kampman asked where the keys were. Defendant said that they were in the car. "[R]ight around the time

[Kampman] was going to retrieve the keys from the driver's area of defendant's vehicle," Potapczak informed Kampman that he learned from Salinas that the bag in defendant's trunk held narcotics. Kampman retrieved the keys, opened the trunk, and opened the shopping bag. It contained a large boot box, and within the box was three kilograms of cocaine. Kampman informed defendant that he was under arrest for the narcotics, handcuffed him, and transported him to the office for further questioning.

¶ 13    Potapczak had been with DHS since about 2011 and had conducted surveillance based on tips from confidential informants over 500 times. He had also seen hand-to-hand drug deliveries over 500 times. The large majority of the exchanges occurred in parking lots of restaurants and stores. Based on his experience, the transaction he observed between Salinas and defendant was a narcotics transaction. Factors that stood out to Potapczak were the transaction's location in a restaurant parking lot; the way defendant moved about his car prior to Salinas driving over, as if he were prepping for the exchange; that defendant appeared nervous; and the fact that the items were exchanged through an open car window. Potapczak had only seen people dine together before a narcotics transaction in 10 to 15 percent of situations.

¶ 14    Kampman testified that he had been with DHS for about nine years; had conducted surveillance based on the tips of confidential informants hundreds of times; and had seen hundreds if not thousands of drug transactions in restaurant and store parking lots. He similarly testified that he believed that the hand-to-hand transaction in the parking lot was a drug deal based on his training and experience. In particular, he had information that Salinas was moving kilogram quantities of narcotics; the black bag he observed was large enough to carry up to six kilograms of narcotics; and the way the bags were passed between the individuals was indicative of narcotics

being given to one person and money to the other. Kampman agreed that it was not typical for someone to leave narcotics and $39,000 in cars while eating in a restaurant for half an hour.

¶ 15   Defendant testified as follows. He had been friends with Salinas for six or seven years. When Kampman pulled up behind him, defendant took about two steps, and Kampman got out of his vehicle with his gun drawn against his vest. Kampman said, " 'Homeland Security, put your hands on top of the car,' " and defendant complied. Kampman asked if defendant had any weapons, and defendant replied in the negative. Kampman patted defendant down and asked where his keys were. Defendant said that they were in the car, and Kampman grabbed them, put them on the seat, and put his gun away. Kampman searched defendant again, spun him around, and pushed him into a squatted position. Kampman then retrieved the keys and opened the trunk; defendant denied consenting to Kampman taking his keys or opening the trunk.

¶ 16   On March 1, 2019, the trial court denied the motion to suppress evidence. On the subject of credibility, it stated that "there [was] nothing in the record to suggest that [the agents'] testimony was effectively challenged in terms of voracity [*sic*], so [it] found them to be credible and indicate that they undertook the surveillance." It further found as follows. A confidential informant provided DHS with information that did not describe any particular drug transactions or anticipated transactions but did consist of an individual's first name, address, and general description. The agents set up surveillance and then followed Salinas from the address in Cook County, through Du Page County, to an IHOP in Cook County. The agents observed Salinas and defendant eating in the restaurant, which was unusual, but it did not preclude the reasonableness of their ultimate conclusion that a hand-to-hand drug transaction took place in the parking lot. The agents saw the cars move towards one another, saw the delivery of a FedEx envelope, and ultimately it was discovered that $39,000 was exchanged for three kilos of narcotics. As the agents approached the

vehicle, they restricted Salinas's and defendant's ability to exit. The requirements of *Terry* were satisfied because the officers reasonably believed that a crime was committed or about to be committed in their presence from what they knew from the tip in conjunction with their observations of behavior that was, in their experience, consistent with a hand-to-hand drug transaction. Upon being approached, one of the individuals said that the package contained bricks, which the agent reasonably interpreted as a reference to the delivery of narcotics. Once that occurred, the agents had probable cause to arrest and search the vehicles incident to the arrests.

¶ 17    Defendant filed a motion to dismiss the indictment on April 17, 2019, arguing that Du Page County was an improper venue because the incident took place in Cook County. In his supporting memorandum, he requested that the trial court either dismiss the charges or transfer the cause to the proper venue. The trial court denied the motion on September 24, 2019, stating that various elements of the offenses and acts constituting the charges were performed in both Cook County and Du Page County.

¶ 18    A bench trial took place on January 14, 2020. The parties stipulated to a transcript of the testimony presented at the hearing on the motion to suppress, with the caveat that defendant was not stipulating that the evidence was sufficient to convict him. The parties also stipulated that the black shopping bag contained three taped bundles. The substance in one bundle consisted of 1003.7 grams of cocaine, and the remaining bundles weighed a total of about 2007.4 grams and were not tested. They stipulated that an expert would testify that one kilogram of cocaine was not an amount for personal use but rather was indicative of an intent to sell or deliver. They stipulated that the street value of the cocaine tested by the lab was $35,000.

¶ 19      The trial court found defendant guilty of both counts and then entered an agreed-upon sentence of 15 years' imprisonment for count 1 followed by three years of mandatory supervised release, plus a $35,000 street value fine. It determined that count 2 merged into count 1.

¶ 20      Defendant timely appealed the trial court's rulings on his motion to suppress and motion to dismiss for improper venue.

¶ 21                                    II. ANALYSIS

¶ 22      Defendant first argues that the trial court erred in denying his motion to suppress evidence. At a hearing on a motion to suppress, the defendant must make a *prima facie* case that the evidence was obtained by an illegal seizure. *People v. Bass,* 2021 IL 125434, ¶ 21. If the defendant meets this burden, the burden shifts to the State to present rebuttal evidence, though the ultimate burden of proof remains with the defendant. *Id.* In reviewing a ruling on a motion to suppress, we defer to the trial court's factual findings and will reject them only if they are against the manifest weight of the evidence. *People v. Lindsey*, 2020 IL 124289, ¶ 14. We accord this deference because the trial court is in a superior position to determine and weigh the witnesses' credibility, observe their demeanor, and resolve conflicts in their testimony. *People v. Lee*, 214 Ill. 2d 476, 483-84 (2005). However, we review *de novo* the ultimate legal ruling on the motion to suppress. *Lindsey*, 2020 IL 124289, ¶ 14.

¶ 23      Defendant argues that Salinas was detained without reasonable suspicion and arrested without probable cause. This raises the question of defendant's standing to assert such arguments. We therefore initially address defendant's related contention that Salinas's "statement," presumably that there were "bricks" in the bag,[1] was not sufficiently attenuated from Salinas's

_____

[1] Defendant does not specify to which statement of Salinas he is referring.

illegal seizure and arrest, such that the trial court erred in allowing the statement to be used against defendant. Defendant cites *People v. Austin*, 293 Ill. App. 3d 784 (1997), among other cases, in arguing that statements made by a co-defendant cannot be imputed to another defendant if the statement stems from an illegal seizure or arrest. *Austin* involved the principle of attenuation, pursuant to which "[a] confession obtained after an illegal arrest may be admissible, if the court determines that it was obtained by means sufficiently distinguishable to be purged of the taint of the illegal arrest." *Id.* at 787; see also *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) (evidence collected following an illegal arrest may be admissible if it is sufficiently attenuated from any illegality). However, application of attenuation would require a determination that defendant was illegally arrested and then made incriminating statements, with the question being if an intervening circumstance broke the connection between his illegal arrest and subsequent confession. See *People v. Simmons*, 372 Ill. App. 3d 735, 744 (2007). Attenuation is therefore not at issue here.

¶ 24    Rather, we find *People v. James*, 118 Ill. 2d 214 (1987), more relevant. In *James*, the defendant argued that his confession should have been suppressed as the unlawful fruit of the unlawful arrest of a co-defendant. Our supreme court stated:

> "It is a fundamental principle that a claim to suppress the product of a fourth amendment violation can be asserted 'only by those whose rights were violated by the search or seizure itself.' Since the defendant's own rights were not violated, he may not vicariously seek suppression of evidence as a remedy for such a violation of another's fourth amendment rights." *Id.* at 226.

See also *People v. Clay*, 349 Ill. App. 3d 517, 524 (2004) (*James* is distinguishable from *Austin* because *James* dealt with whether the police had probable cause to arrest the defendant, and not whether a statement was sufficiently attenuated from an illegal arrest).

¶ 25    Here, *James* prevents defendant from directly contesting whether Salinas was properly seized and arrested. We note that the State also cites *James* in its brief, but defendant does not address the case in his reply brief, other than citing Justice Quinn's concurrence in *Austin*, 293 Ill. App. 3d at 792 (Quinn, J., specially concurring). There, Justice Quinn stated, "It is difficult to understand why probable cause to arrest a defendant may be based on the statement of an illegally arrested co-defendant (as in *James*) but that this same statement cannot be used as attenuation." However, defendant's citation actually emphasizes that a statement by an (allegedly) illegally-arrested codefendant, in this case Salinas, may serve as probable cause to arrest a defendant, and that such a scenario is treated differently from attenuation by caselaw.

¶ 26    That being said, we recognize that defendant's seizure was a direct result of the agents' information about Salinas and their observations of his interactions with Salinas, which also played a role in their subsequent arrest of defendant. We therefore consider his arguments pertaining to Salinas from the perspective of defendant's own seizure and arrest.

¶ 27                                A. *Terry* Stop

¶ 28    The fourth amendment of the United States Constitution (U.S. Const., amend IV) and article 1, section 6 of the Illinois Constitution (Ill. Const. 1970, art. I, § 6) protect people from unreasonable searches and seizures. *People v. Timmsen*, 2016 IL 118181, ¶ 9. Under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may briefly detain a person without probable cause if the officer reasonably believes that a crime has been or is about to be committed. *People v. Baker*, 2020 IL App (2d) 180300, ¶ 17. The detention must be temporary and last no longer than necessary to effectuate the stop's purpose. *People v. Sutton*, 2020 IL App (1st) 181616, ¶ 20. The officer must be able to cite specific, articulable facts which, when combined with rational inferences from those facts, make the intrusion reasonable. *People v Gallager*, 2020 IL App (1st) 150354, ¶ 33. In other

words, the brief investigatory detention must be supported by a reasonable, articulable suspicion of criminal activity. *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006). Reasonable suspicion is a lower standard than probable cause, but it must consist of more than an unparticularized suspicion or hunch of criminal activity. *Timmsen*, 2016 IL 118181, ¶ 9. In judging the officer's conduct, we apply an objective standard (*Gallager*, 2020 IL App (1st) 150354, ¶ 34), and we consider the totality of the circumstances in evaluating the stop's validity (*Timmsen*, 2016 IL 118181, ¶ 9).

¶ 29    Defendant argues that the agents did not have reasonable suspicion to detain him and Salinas when they blocked their vehicles from leaving. He maintains that the informant's tip was stale because it was obtained four to six weeks prior to the incident. He notes that Salinas's arrest was over 30 years prior and that he was a subject of a drug trafficking investigation 18 years before. Defendant cites *United States v. Payne*, 181 F.3d 781, 789 (6th Cir. 1999), where the court stated that a tip that the defendant possessed a large amount of drugs six weeks earlier was insufficient to create a reasonable suspicion because the tip was stale and did not have any of the traditional indicia of reliability. He also cites *People v. Damian*, 299 Ill. App. 3d 489, 492 (1998) (controlled drug buy six weeks prior was too stale to support probable cause).

¶ 30    Defendant further argues that the informant's tip was unreliable because it provided only Salinas's first name, his address, and that he was generally dealing drugs at the time. Defendant highlights that the informant did not know Salinas personally and did not provide any information that he would perform a narcotics transaction on September 13, 2017, or any particular date, and did not reveal how he knew the information. Defendant analogizes this case to *Florida v. J.L.*, 529 U.S. 266, 270 (2000), *People v. Lopez*, 2018 IL App (1st) 153331, and *United States v. Lopez*, 907 F.3d 472 (7th Cir. 2018).  In *J.L.*, 529 U.S. at 270, the Supreme Court held that an anonymous tip that a young black man in a plaid shirt at a particular bus stop was carrying a gun, with no further

indicia of reliability, did not justify an investigatory stop where the police corroborated only the man's location and appearance. In *Lopez*, 2018 IL App (1st) 153331, ¶¶ 21-23, the court held that a conclusory allegation of drunk driving without a basis for that knowledge or a source for the tip was insufficient to create reasonable suspicion, despite information leading to the stop of a specific car.

¶ 31    In *United States v. Lopez*, 907 F.3d at 476, a man confessed to transporting drugs for a trafficking organization. He said that he would receive a phone call, pick up a white Chevrolet Malibu from a parking lot, drive it to a residential garage on a particular street, a man named Fausto would take money out of the Malibu and replace it with drugs in the closed garage, and then he would drive the vehicle back to the parking lot and leave it there. *Id.* at 476, 482. The informant subsequently refused to cooperate with the police. The next day, the police confirmed that a man named Fausto Lopez lived at the address, obtained a picture of him, and set up surveillance. Later the same day, the police saw a white van pull up to the garage, and Lopez and another man got out with shopping bags. *Id.* Lopez then got back in the van and drove down an alley, at which point the police seized him. *Id.* at 476-77. The court held that the police lacked a reasonable suspicion because the officers' observations did not corroborate the informant's description of how the drug transactions took place or provide an independent source of reasonable suspicion, and the informant was not previously known to the police and stopped cooperating with them as soon as he was outside of their presence. *Id.* at 482-84.

¶ 32    Defendant argues that as in both *Lopez* cases, the informant's tip here had no specific allegations as to what they had witnessed and did not provide a specific manner or dates regarding Salinas's drug deliveries. He further maintains that similar to all three aforementioned cases, the

agents confirmed only the tip's basic characteristics. Defendants asserts that the tip was devoid of detail and conclusory, without corroboration of criminal activity as caselaw requires.

¶ 33    Defendant acknowledges that the agents observed him and Salinas exchanging items, but he argues that a single transaction involving the exchange of unidentified objects was not sufficient to detain either person. He analogizes this case to *People v. Trisby*, 2013 IL App (1st) 112552, ¶ 17 ("probable cause is not established by a single hand-to-hand transaction involving an unidentified object together with a few furtive hand movements toward a pants pocket" in a high-narcotics area); *People v. Petty*, 2012 IL App (2d) 110974, ¶¶ 3, 17 (no reasonable suspicion where drivers pulled into a parking lot, exited their cars and made a hand-to-hand exchange, and returned to their cars; the defendant's actions were consistent with innocent conduct, and the officers did not have any other reasons to believe that criminal conduct had taken place); *People v. Ocampo*, 377 Ill. App. 3d 150, 161-62 (2007) (officer lacked reasonable suspicion where he saw the defendant come out from behind a gas station, tap on a car's trunk, get in, talk to the driver, and move as if he were taking something out of his pocket); and *United States v. Lopez.* He argues that the agents observed only an exchange of unidentified objects between him and Salinas, which was insufficient to detain either of them.

¶ 34    Defendant additionally argues that Kampman fully searched his entire person, thereby exceeding the scope of a *Terry* pat-down search. He asserts that Kampman spun him around, forced him into a squatting position, and searched his entire body. Defendant cites *People v. Garza*, 2018 IL App (3d) 170525, ¶¶ 17-18, where the court stated that the officer's search of vehicle occupants' pockets, waistbands, hats, socks, and shoes was similar to a search incident to an arrest and evinced a growing custodial atmosphere.

¶ 35    The State argues that Kampman received a reliable tip from a known informant who had previously aided in narcotics investigations. The State maintains that the corroboration of the details that the informant provided further supported the reliability of the tip. The State argues that, having verified those details, the agents could suspect that the "remaining unverified bit," that Salinas was trafficking drugs, "was likewise true." *Draper v. United States*, 358 U.S. 307, 313 (1959). According to the State, the agents then saw Salinas and defendant engage in what was, based on their experience, an apparent drug transaction, providing at least reasonable suspicion to detain them. The State argues that the cases that defendant cites do not address whether a tip coupled with the observation of a hand-to-hand drug transaction constitute reasonable suspicion, other than *United States v. Lopez.* The State asserts that *Lopez* is distinguishable because the tip was not from a reliable source, and the suspect's actions of unloading paper bags in his open garage was innocuous, did not match the tip's details, and did not provide reasonable suspicion that a crime had occurred.

¶ 36    We agree with defendant that the agents seized him and Salinas when they blocked in their vehicles and prevented them from leaving. See *People v. Nitz*, 371 Ill. App. 3d 747, 751 (2007) (the defendant was seized when the officer pulled his unmarked squad car behind the defendant's parked vehicle, preventing the defendant from leaving without abandoning his vehicle). However, we disagree with defendant that the agents lacked reasonable suspicion to do so. Unlike the cases that defendant cites, the informant here was described as a "confidential informant" as opposed to an anonymous informant. See *People v. Monroy-Jaimes*, 2019 IL App (2d) 160426, ¶ 17 ("A confidential informant is deemed more reliable than an anonymous informant."); *People v. Miller*, 2014 IL App (2d) 120873, ¶ 24 (information from identified informant is more reliable than anonymous tip). The informant was additionally reliable in that Kampman had worked with him

five to eight times before, with his information "almost always" leading to the seizure of large amounts of narcotics or currency, further distinguishing this case from those that defendant cites. See *People v. Nitz*, 371 Ill. App. 3d 747, 751-52 (2007) (in assessing whether an informant's tip will support an investigatory stop, it is relevant whether the informant has a track record of providing reliable information in prior cases). Additionally, the agents corroborated information provided by the informant, including the target's name, address, ethnicity, and age, along with his prior history involving drugs. Indicia of a tip's reliability include facts known to the officer that corroborate the tip, though corroboration of innocent details or information that can be readily-known is of little value. *Id.* at 751. Here, Salinas's name, address, and age provided slight value, but the fact that he had a past record of narcotics, albeit from many years ago, was less knowable and provided greater corroboration.

¶ 37    Significantly, the agents did not seize Salinas based just on the informant's tip. Rather, they saw him put a black shopping bag in his car and followed him to the IHOP, where Salinas met with defendant. After they finished eating, they did not simply drive away, but rather Salinas drove his car so that it was next to defendant's vehicle. Through Salinas's open driver's-side window, defendant handed Salinas a large FedEx envelope that appeared full and heavy. Salinas then gave defendant the black shopping bag, which defendant placed in his trunk. The agents believed that they were witnessing a hand-to-hand drug transaction based on their experience, and they listed factors such as the exchange taking place in a restaurant parking lot, defendant appearing nervous and moving about his car before the exchange, and that the items were exchanged through an open car window. See *People v. Dunmire*, 2019 IL App (4th) 190316, ¶ 73 (officers may rely on their own experience and specialized training to draw inferences from the cumulative information available to them that may not occur to an untrained person). This situation is distinguishable from

*Payne*, *Damian*, *Trisby*, *Petty*, and *Ocampo* because none of those cases involved observation of a hand-to-hand exchange coupled with an informant's tip.

¶ 38    *United States v. Lopez* involved both a tip and police observations, but as the State argues, that case is also distinguishable.[2] First, the informant was not as reliable as the informant here because he did not have a history of providing police with information that led to the seizure of large amounts of narcotics and currency, and because the *Lopez* informant immediately became uncooperative after providing the information. Second, the *Lopez* informant provided detailed information about how drug transactions with the target took place, including the type of vehicle, the driver, and that the exchange would take place in a closed garage, but the activity that the police observed was very different. *Lopez*, 907 F.3d at 476, 482. Last, the agents here observed an exchange that was consistent with a hand-to-hand drug transaction, which did not occur in *Lopez*.

¶ 39    Considering the totality of the circumstances, primarily the prior reliability of the informant and the agents' observation of what they suspected from their experience to be a hand-to-hand-drug transaction, and to a lesser extent corroboration of information that the informant provided, we conclude that the agents had a reasonable suspicion that a crime had been committed, and were therefore justified in stopping defendant.

¶ 40    Defendant's argument that Kampman exceeded the scope of a *Terry* pat-down search is not directly related to whether the agents were justified in seizing defendant. Even otherwise, we note that neither Kampman nor defendant described an extensive search like that in *Gaza*. Moreover, once a *Terry* stop is initiated, an officer may conduct a pat down search for weapons if

---

[2] We further note that decisions by lower federal courts are generally not binding but may be considered as persuasive authority. *Pielet v. Pielet*, 2012 IL 112064, ¶ 39.

they believe that the individual being investigated at close range is armed and dangerous. *People v. Spain*, 2019 IL App (1st) 163184, ¶ 23. Given that the agents believed that Salinas was transporting large quantities of narcotics and that they had witnessed a hand-to-hand transaction of the drugs, Kampman would have been justified in patting down defendant for protective purposes. *Cf. People v. DeLuna*, 334 Ill. App. 3d 1, 11-12 (2002) (officer justified in patting down the defendant where, among other things, the defendant knocked on the door of an apartment being searched for drugs).

¶ 41                               B. Probable Cause to Arrest

¶ 42    Defendant next argues that when Potapczak seized Salinas's keys, he effectively arrested Salinas without probable cause, requiring suppression of Salinas's statement. As discussed, defendant may not seek to suppress evidence on the basis Salinas was improperly arrested, where that evidence was used to support probable cause to arrest defendant. *James*, 118 Ill. 2d at 226. Accordingly, we move on to defendant's argument that he himself was arrested without probable cause.

¶ 43    "To establish probable cause, it must be shown that the totality of the facts and circumstances known to the officer at the time of the search would justify a reasonable person in believing that the automobile contains contraband or evidence of criminal activity." *People v. Hill*, 2020 IL 124595, ¶ 23. In assessing whether probable cause exists, an officer may rely on their law enforcement training and experience. *Id.* Probable cause is a flexible, commonsense standard that deals with probabilities as opposed to certainties, and it does not require an officer to rule out innocent explanations for suspicious facts. *Id.* ¶ 24. We evaluate probable cause from the standpoint of an objectively reasonable officer. *Id.* ¶ 23.

¶ 44    Defendant argues that he was effectively arrested the moment Kampman took his keys from inside the vehicle, and that the only information that Kampman knew at the time was that an exchange of unidentified objects took place between Salinas and defendant. See *People v. Boston*, 2018 IL App (1st) 140369, ¶ 87 ("We determine whether a person is under arrest based on whether an objective reasonable person, innocent of any crime, would conclude that he is not free to leave under the circumstances."). Defendant cites *People v. Bailey*, 2019 IL App (3d) 180396, for the proposition that taking a person's car keys is an example of effectuating an arrest. In *Bailey*, the court held that the officer's actions of confiscating the defendant's keys and using them to unlock the defendant's vehicle to conduct a search required probable cause. *Id.* ¶¶ 24, 28.

¶ 45    This case is distinguishable from *Bailey* because Kampman testified that defendant gave him permission to search the car before Kampman asked for the keys. More significantly, "right around the time [Kampman] was going to retrieve the keys from the driver's area of defendant's vehicle," Potapczak informed Kampman that he learned from Salinas that the bag in defendant's trunk held narcotics. This testimony indicates that Kampman had not yet taken the keys when he learned that Salinas admitted that the bag contained drugs. See also *People v. Durden*, 2017 IL App (3d) 160409, ¶ 17 (probable cause can be established from all information collectively received by officers working together). Given the information provided by the informant, the agents' observation of what they believed from experience to be a hand-to-hand drug transaction, and Salinas's statement that the bag in defendant's trunk contained narcotics, Kampman had probable cause to arrest defendant before Kampman retrieved the keys.[3]

---

[3] In his reply brief, defendant argues that Kampman arrested him when he initially approached him with his gun drawn. In his opening brief, defendant discussed Kampman's

¶ 46            C. Consent to Search Vehicle & Fruit of Poisonous Tree Doctrine

¶ 47    Defendant additionally argues that his alleged consent to search his vehicle was the product of an illegal *Terry* detention, frisk, and arrest, and therefore the consent was invalid. He argues that as a result, evidence and statements must be suppressed under the fruit of the poisonous tree doctrine. See *People v. McIntosh*, 2020 IL App (5th) 170068, ¶ 45 (under the fruit of the poisonous tree doctrine, evidence is suppressed if it was obtained in violation of a defendant's fourth amendment rights).

¶ 48    We have already addressed these underlying arguments and determined that they lack merit. That is, we have concluded that Kampman had reasonable suspicion to stop defendant, did not err in patting him down, and had probable cause to arrest defendant before he retrieved defendant's keys. We therefore do not further analyze the consent issue, other than in conjunction with defendant's subsequent argument about *Miranda* warnings.

¶ 49                    D. *Miranda* Warnings

¶ 50    Defendant next argues that he was in custody when Kampman boxed in his car in the parking lot, and because Kampman never provided him with *Miranda* warnings, any statements that he made after being asked whether there were any drugs, money, or guns in the car must be suppressed.

---

drawing of his gun in conjunction with whether defendant was under custodial interrogation for *Miranda* purposes, and not in conjunction with his argument about probable cause. Regardless, "the status or nature of the investigatory stop does not change merely by virtue of the officer's drawing a gun or using handcuffs." *People v. Leggions*, 382 Ill. App. 3d 1129, 1133 (2008).

¶ 51    Defendant answered in the negative when asked the aforementioned question, so his response did not constitute incriminating evidence that would need to be suppressed. The only other meaningful statement he made was his consent to search his vehicle, according to Kampman's testimony. However, before Kampman acted on this consent, Salinas stated that the bag in defendant's trunk contained narcotics, which gave Kampman probable cause to arrest defendant. Moreover, "[u]nder the automobile exception, police officers may search a vehicle without a warrant where probable cause exists to believe the automobile contains evidence of criminal activity subject to seizure." *People v. Contreras*, 2014 IL App (1st) 131889, ¶ 28. In this case, the same considerations that led to Kampman having probable cause to arrest defendant also provided probable cause to believe that defendant's car contained evidence of criminal activity, namely narcotics, subject to seizure, allowing Kampman to search the vehicle without a warrant and without defendant's consent. Accordingly, we need not substantively evaluate defendant's argument regarding *Miranda* warnings.

¶ 52                                    E. Venue

¶ 53    Last, defendant argues that the trial court erred in denying his motion to dismiss the indictment or transfer venue. Defendant points out that the Illinois Constitution gives a defendant the right "[i]n criminal prosecutions *** to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." Ill. Const. 1970, art. I, § 8. Defendant further highlights that "[c]riminal actions shall be tried in the county where the offense was committed, except as otherwise provided by law." 720 ILCS 5/1-6(a) (West 2018). Upon the written motion of a defendant, the trial court may dismiss the indictment on the basis of improper venue (725 ILCS 5/114-1(d-5) (West 2018)) or order the cause transferred (725 ILCS 5/114-1(f) (West 2018)).

¶ 54    Defendant argues that the trial court was incorrect in its factual finding and application of law when ruling that he committed possession of a controlled substance in both Cook and Du Page County. Defendant acknowledges that venue is proper where any element of the offense charged is committed. *People v. Eggerman*, 292 Ill. App. 3d 644, 650 (1997). The elements of unlawful possession of narcotics with intent to deliver are that the defendant had knowledge of the narcotics' presence, the drugs were in the defendant's immediate possession or control, and the defendant intended to deliver the narcotics. *People v. Robinson*, 167 Ill. 2d 397, 407 (1995). Defendant argues that the agents did not know of his existence until he was at the IHOP in Cook County, that the exchange of objects took place in the IHOP parking lot, and that unlike Salinas, the agents did not observe defendant traveling through Du Page County. Defendant maintains that Salinas's conduct was not in any way relevant to defendant's charges, and they were not charged with any accountability crimes.

¶ 55    Defendant cites three cases in discussing how venue is analyzed in possession-based crimes: *People v. Adams*, 161 Ill. 2d 333 (1994); *People v. Steading*, 308 Ill. App. 3d 934 (1999); and *Eggerman*, 292 Ill. App. 3d 644. *Adams* involved two consolidated cases. In the first case, the supreme court held that the defendant was properly tried in Cook County because he gained exclusive possession of the vehicle at issue and drove it in Cook County, and it could be inferred that he possessed the requisite intent to deprive the owner of the vehicle. *Adams*, 161 Ill. 2d at 344. In the second case in *Adams*, the defendant and her associates boarded a plane in Miami, with the flight having a scheduled stop in Chicago. *Id.* at 338. The associates hid drugs in the plane's lavatory, and the defendant and the associates were arrested when the plane landed in Chicago. *Id.* at 338-39. The court held that the defendant's associates maintained constructive possession of

narcotics in Cook County, and that the defendant was liable based on accountability. *Id.* at 344-45.

¶ 56   In *Steading*, this court held that venue was proper in Du Page County even though the vehicle was stolen and recovered in Cook County, because an officer testified that he saw the defendant driving the vehicle in Du Page County. *Steading*, 308 Ill. App. 3d at 943. In *Eggerman*, the defendant pleaded guilty to possession of a stolen motor vehicle in Lake County, and the State subsequently sought to charge him in Cook County with aggravated vehicular hijacking, vehicular hijacking, armed robbery, and robbery related to the same vehicle. *Eggerman*, 292 Ill. App. 3d at 646-47. The defendant sought to dismiss the charges based on double jeopardy, and the appellate court agreed, stating in relevant part that the subsequent charges could have been brought in Lake County because that is where the defendant had exerted control over the stolen vehicle. *Id.* at 650-51.

¶ 57   Defendant argues that like the defendants in *Adams*, he constructively possessed the cocaine found in his vehicle's trunk, which occurred in Cook County. He argues that *Adams*, *Steading*, and *Eggerman* would agree that Salinas's possession and knowledge of the presence of the controlled substance is not relevant as to whether defendant knowingly possessed a controlled substance in Cook County.

¶ 58   Regarding defendant's constitutional argument, the State cites *People v. Carroll*, 260 Ill. App. 3d 319, 334 (1992), which states that the constitution "merely guarantees that the trial be held where the indictment alleges the offense was committed." The State argues that the indictment alleged that defendant committed his crimes in both Cook and Du Page Counties, so holding the trial in Du Page County complied with the constitutional requirement. The State argues that the statutory provisions regarding venue were also satisfied. The State cites sections 1-6(m) and 1-

6(n) of the Criminal Code of 2012 (720 ILCS 5/1-6(m), (n) (West 2018)). Section 1-6(m) states, "A person who commits an inchoate offense may be tried in any county in which any act which is an element of the offense, including the agreement in conspiracy, is committed." 720 ILCS 5/1-6(m) (West 2018). Section 1-6(n) states, "Where a person in one county solicits, aids, abets, agrees, or attempts to aid another in the planning or commission of an offense in another county, he may be tried for the offense in either county." 720 ILCS 5/1-6(n) (West 2018).

¶ 59    The State additionally cites *People v. Brown*, 107 Ill. App. 3d 742 (1982). There, the defendant was indicted for conspiracy to deliver a controlled substance, which involved two accomplices. *Id.* at 742. He argued that he could not be tried in Rock Island County because his actions all took place in Cook County. *Id.* at 743. The appellate court disagreed, stating that the agreement to buy heroin occurred in Rock Island County by the accomplices even though the ultimate purchase took place in Cook County, and it was immaterial that the defendant was unaware of the plot and never set foot in Rock Island County. *Id.* at 744. The State maintains that, likewise, venue was proper in Du Page County based on Salinas's actions, which included possessing and transporting the bricks of cocaine through Du Page County as part of their prearranged drug sale, as Salinas was defendant's accomplice.

¶ 60    Defendant responds that the State forfeited its constitutional argument by not raising it below. Defendant alternatively maintains that it would be a violation of due process to permit an accused to be tried in an improper county, unless the accused waives such right, which did not occur here. On the question of accountability, defendant cites *People v. Raya*, 250 Ill. App. 3d 795, 800-01 (1993), where the court stated:

> "If this defendant can be held criminally responsible for having the intent to deliver narcotics under the facts in this record, then every person who solicits drugs from a supplier

or source for his own personal ingestion could be held accountable for the possession with the intent to deliver of the supplier."

Defendant argues that this reasoning applies to him, and that there was no evidence that he had the specific intent to have a person bring the drugs to him for other than his personal use. He contends that it was impossible for him to have the specific intent to help Salinas deliver drugs to himself. See 720 ILCS 5/5-2 (West 2016) (a person is not accountable if "the offense is so defined that his or her conduct was inevitably incident to its commission").

¶ 61    Regarding the issue of conspiracy, defendant argues that *Brown* is inapplicable because there was no conspiracy charge here and because he did not have an accomplice. Citing federal cases, he also argues that a single buy-sell between two people cannot amount to a conspiracy.

¶ 62    In reviewing a ruling on a motion to transfer venue, we apply a bifurcated standard of review. *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 153-54 (2005). We will not disturb the trial court's factual findings if they are not against the manifest weight of the evidence, but we review the trial court's legal conclusion *de novo*. *Id.* at 154.

¶ 63    As defendant points out, the Illinois Constitution gives a defendant the right "[i]n criminal prosecutions *** to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." Ill. Const. 1970, art. I, § 8. Still, the "constitutional guarantee does not mandate a single exclusive location for a crime, nor does it limit the General Assembly's ability to establish where a crime will be committed, as that crime is defined by the General Assembly." *People v. Bochenek*, 2021 IL 125889, ¶ 11. In line with the constitutional mandate, the General Assembly had determined that " '[c]riminal actions shall be tried in the county where the offense was committed, except as otherwise provided by law.' " *Id.* (quoting 720

ILCS 5/1-6(a) (West 2016)). Over time, however, the General Assembly enacted statutes recognizing that proper venue may lie in more than one county. *Id.* ¶ 13.

¶ 64 Defendant's assertion that the State forfeited its constitutional argument is without merit, because an appellee may raise an issue for the first time on appeal to defend a judgment as long as the factual basis was before the court. *Bailey v. Mercy Hospital & Medical Center*, 2020 IL App (1st) 182702, ¶ 117. Article I, section eight of the Illinois Constitution "has been interpreted to mean that the accused has a right to be tried in the county where the charging instrument alleges that the offense took place" (*People v. Gallegos*, 293 Ill. App. 3d 873, 876–77 (1997)), so we agree with the State that the constitutional provision was satisfied here. However, that does not answer the question of whether the trial court erred in denying defendant's motion to transfer venue.

¶ 65 Assessing the potential application of sections 5/1-6(m) and (n) requires applying principles of statutory interpretation. When interpreting a statute, our primary objective is to ascertain the legislative intent, which is best indicated by the plain and ordinary meaning of the statute's language. *People v. Miles*, 2020 IL App (1st) 180736, ¶ 9. We focus on section 1-6(n), which states, "Where a person in one county solicits, aids, abets, agrees, or attempts to aid another in the planning or commission of an offense in another county, he may be tried for the offense in either county." 720 ILCS 5/1-6(n) (West 2018). We agree with the State that section 1-6(n) does not require a defendant be charged with accountability for the section to apply. Indeed, "[a]ccountability is not a crime in and of itself but, rather, a mechanism through which a criminal conviction may result." *People v. Pollock*, 202 Ill. 2d 189, 210 (2002). "Section 1–6(n) *** commands that where the State proves that a defendant aids and abets in one county the commission of a crime in another county, the State has sufficiently proved the element of venue in either county." *Carroll*, 260 Ill. App. 3d at 330.

¶ 66    A person is legally accountable for another's conduct when:

"either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2016).

Additionally:

"When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts." *Id.*

Venue may be proven by either direct or circumstantial evidence. See *People v. Digirolamo*, 179 Ill. 2d 24, 49 (1997); *People v. Clark*, 71 Ill. App. 3d 381, 396 (1979).

¶ 67    Here, defendant testified that he had been friends with Salinas for six or seven years, which shows a long-term relationship. Clearly, they agreed to meet at the IHOP primarily to exchange the drugs for money. This arrangement resulted in Salinas transporting the drugs through Du Page County to Cook County. At trial, the parties stipulated that an expert would testify that one kilogram of cocaine was not an amount for personal use but rather was indicative of an intent to sell or deliver, so defendant's argument that no evidence that he had the specific intent to have Salinas bring the drugs to him for other than his personal use is meritless, as is his related reliance on *Raya*. The parties additionally stipulated that the street value of the one kilogram of cocaine tested by the lab was $35,000, and the evidence indicated that there were about two kilograms more of the drug, albeit untested by the lab. The FedEx envelope contained about $39,000 cash, which is further evidence of a substantial criminal design or agreement, as Salinas or someone else

would presumably collect more money from defendant once the drugs were sold. Based on these considerations, defendant and Salinas came to a common agreement to have Salinas bring defendant drugs so that defendant could sell them, so defendant was legally accountable for Salinas's conduct under sections 5-2(c) and 1-6(n). Salinas drove through Du Page County in furtherance of the agreement, such that Salinas's presence with the drugs in Du Page County was attributable to defendant under the same statutes. We therefore conclude that venue was proper in Du Page County under section 1-6(n), and that the trial court did not err in denying defendant's motion to dismiss the indictment or transfer venue. The cases that defendant cites are distinguishable because they do not analyze or apply section 1-6(n). *Cf. Carroll*, 260 Ill. App. 3d at 330-31 (where the facts established that each defendant was aiding and abetting each other in the commission of the crime, venue was established in both Cook and Will Counties pursuant to section 1-6(n)).

¶ 68                                    III. CONCLUSION

¶ 69    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 70    Affirmed.